Eugene THOMAS, Sr., et al.

v.

Russell FREDERICK, et al.

Civ. A. No. 87–1950.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 4, 1991.

Christian Goudeau, Anne Elizabeth Watson, Sandoz, Sandoz & Schiff, Opelousas, La., Michael M. Essmyer, Houston, Tex., for plaintiffs.

Chester R. Cedars, Gauthier & Cedars, Ltd., Breaux Bridge, La., T. Allen Usry, Usry & Weeks, Metairie, La., for defendants.

## MEMORANDUM OPINION

MILDRED E. METHVIN, United States Magistrate Judge.

### I. INTRODUCTION.

The plaintiffs are black citizens who instituted this suit alleging that their constitutional rights were violated, and that they are entitled to compensatory and punitive damages, and attorney's fees under the provisions of 42 U.S.C. Sections 1983, 1985, 1986 and 1988. Plaintiffs also claim relief under Louisiana tort law.

Plaintiffs are Eugene Thomas, Sr.; his wife, Mary Verina Thomas, now deceased [1]; and two of their major children, Eugene Thomas, Jr. and Ada Thomas Washington. At the time of the events in question, Eugene, Sr. and Mary were long-time residents of Parks, Louisiana, a village in St. Martin Parish. They lived in a home neighboring the homes of Eugene, Jr. and his wife, and Ada and her husband. Other members of the Thomas family also resided in the immediate area.

Defendants are Russell Frederick and John Pourciaux, Deputy Sheriffs with the St. Martin Parish Sheriff's Department, and Sheriff Charles Fuselier, both in his individual and official capacities.[2] Defendants are white.

This matter was tried before the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c). A three-day bench trial was conducted on Oc-

tober 29, 30 and November 1, 1990, and all post-trial briefs have been filed. The court's findings of fact and conclusions of law are set forth below as required by Rule 52(a) F.R.C.P.

### II. FINDINGS OF FACT.

#### A. BACKGROUND.

In 1986, Eugene Thomas, Jr. was running for the second time for police chief of Parks. The white incumbent, Gary P. Bienvenu, Sr., had defeated Thomas in 1982 by a vote of 169 to 123 (58% to 42%), in a race in which Thomas had done very little campaigning. Thomas was doing much more campaigning in 1986, and since two-thirds of the registered voters in Parks were black, he felt he had a good chance of winning.

At that time, Russell Frederick had been a deputy sheriff for St. Martin Parish for a number of years. He was well-acquainted with the Thomas family, particularly Eugene, Jr., who had been a police officer for the City of St. Martinville for several years in the late–1970's. Relations between Frederick and the Thomases had been generally friendly until Eugene, Jr. announced his candidacy against Bienvenu in 1986. Frederick was a personal friend of Bienvenu's and actively supported him during his campaign. In fact, Frederick advised Eugene, Jr. on several occasions not to run against Bienvenu.

As the election neared, relations between Frederick and Eugene, Jr. deteriorated. One Friday evening in late August, 1986, Frederick and several other people had gathered for a few drinks in the yard of a neighbor of Eugene, Sr. and Mary Thomas. When Eugene, Jr. arrived to visit his parents, Frederick made several racial remarks, referring to Eugene, Jr. as a "nigger" and stating he was a "damned fool" if he thought he was going to beat Bienvenu in the election. After further exchanges, Eugene, Jr. telephoned Sheriff Fuselier to

---

1. Mary Verina Thomas died of cancer shortly before the trial of this matter. The remaining plaintiffs are Mary's legal heirs, and have been substituted in this suit in her behalf.

2. A fourth defendant, Roy Bonvillian, was dismissed by joint motion of the parties at the close of the trial.

report that Frederick had become abusive. The following Monday, Frederick telephoned Eugene, Jr. at his job and told him that unless he withdrew his complaint, "it would be doomsday before you see light again." Eugene, Jr. thereafter telephoned the sheriff and withdrew his complaint against Frederick.

Shortly after this incident, Frederick was in a grocery store owned by Betty Courville. Courville sought Frederick's advice concerning two checks—one for $18.00 and one for $29.53—which had been given to her by Eugene Thomas, Jr. on August 6, 1986, and which had been returned by the bank with the notation, "account closed." Courville had not contacted Eugene, Jr. regarding the returned checks either by mail or by telephone.

Seizing upon this opportunity to publicly discredit Eugene, Jr., Frederick over the next several days obtained and filled out the necessary forms to effectuate his arrest. Frederick arranged for a local justice of the peace, Bobby Champagne, to visit Courville's store early on the morning of Tuesday, September 16, 1986, where a reluctant Courville signed the formal complaint and Champagne signed the arrest warrant. Champagne then delivered the documents to Frederick at the Sheriff's Department.

At no time prior to the execution of the arrest warrant did anyone contact Eugene, Jr. regarding the returned checks. Although there was some testimony to the contrary, the court found it unconvincing. Champagne, the justice of the peace, testified that he was "pretty sure" he spoke to Eugene, Jr. about the checks before he signed the warrant, and that Eugene "probably" told him he'd take care of it. Courville testified that she tried to contact Eugene, Jr. by telephone, but was unsuccessful. She stated that in previous similar instances, the Sheriff had advised her to send a certified letter to the maker of the check. She did not send any written notification to Eugene, Jr.

The testimony of both Champagne and Courville was hampered by memory lapses and contradictions. For example, Courville indicated in a pretrial deposition that Frederick had pressured her to sign the complaint against Eugene, Jr. At trial, however, she denied any coercion by Frederick. The court had the distinct impression that both witnesses had gone along with Frederick's plan somewhat reluctantly, but that to admit it would have been to diminish their own roles and increase Frederick's, damaging the defense. Frederick continues to hold a commission as a deputy sheriff for the parish on a part-time basis, and Sheriff Fuselier remains in office. The testimony of both Courville and Champagne was given little weight.

## B. THE EXCESSIVE FORCE CLAIM.

After obtaining the warrant from Champagne, Frederick called Deputy Pourciaux to serve as back-up for the arrest of Eugene, Jr. Sometime between 8:00 and 8:30 a.m. Frederick and Pourciaux parked their separate vehicles in front of Eugene, Jr.'s home. Although Frederick was dressed in plain clothes and drove an unmarked car, there is no dispute that he was known to the plaintiffs as a deputy and was acting in his official capacity. Pourciaux was in uniform and drove a police vehicle.

As the deputies exited their vehicles, Frederick saw Mary Thomas walking toward her mother's house, located next door to Eugene, Jr.'s house. Frederick called to her and they had a brief friendly conversation during which Frederick asked Mary to go get Eugene, Jr. The deputies remained standing beside their vehicles on the street while Mary went to Eugene, Jr.'s house.

Eugene, Jr. and Mary returned to the street where Frederick, in a friendly manner, told Eugene that he had "two checks on him that had bounced." Eugene responded with some incredulity since he had not been notified either by the bank or Betty Courville, in whose store he had been the night before, that there was any problem. At Eugene, Jr.'s request, Frederick showed him the checks which had been stamped "account closed." Eugene again protested that there must be some mistake, since he had received a recent bank statement which showed no problem with the

account. In fact, as the parties stipulated at trial, the bank had committed an error in stamping the checks "account closed". The account was still open, although there were insufficient funds to cover the checks due to a miscommunication between Eugene, Jr. and his wife.

With Frederick's permission, Mary and Eugene went into Eugene's house to retrieve the bank statements and canceled checks which would prove that the account had not been closed. After retrieving some of the documents, Eugene went outside to speak to Frederick. After a brief conversation, Eugene returned to the house as Mary went outside with other documents to show Frederick, including some checks on the same account which had recently cleared the bank.

Mary showed Frederick the documents, explaining that the account clearly was not and had not been closed over the time period in question. Frederick responded that Mary should not interfere in "police business." Frederick further remarked that Mary was "too damn smart" and "you-all always have an excuse for everything." When Mary continued to press her point, Frederick grabbed her by the arms, swung her around and shoved her violently against the side of his car. He continued to hold her against the car as Mary's daughter, Ada Washington, screamed for help. When no one came, Ada ran up to Frederick from behind and hit him on top of the head with her fist. Startled but not hurt, Frederick released Mary, who fled to her mother's house. At no time did Frederick tell Mary that she was under arrest.

Pourciaux did nothing but observe the events, although he came to Frederick's aid when Ada struck him on the head.

When Eugene, Jr. came back outside, Frederick placed him in his vehicle and took him to the Sheriff's Department for booking.

In the meantime, Mary Thomas telephoned Sheriff Fuselier and reported the incident to him. Several other members of the Thomas family also spoke to the Sheriff. Although he responded that he would look into the matter, neither the Sheriff nor any member of his staff has ever contacted the Thomas family regarding the incident.

### C. BOOKING OF MARY THOMAS.

At the Sheriff's Office, Eugene, Jr. was booked on two counts of theft by fraud and was released on bond. The entire process took less than 30 minutes. Before Eugene, Jr. left, Frederick told him and Eugene, Sr., who had come to assist his son, that he was issuing an arrest warrant for Mary for interfering with an officer. At Frederick's request, Eugene, Sr. drove to Parks, retrieved Mary and returned to the Sheriff's Office at approximately 11:00 a.m.

When Mary arrived, Frederick brought her into an interrogation room where he proceeded to verbally harass her. When she asked to see her attorney, he advised her that she did not need one. At some point, Mary refused to answer questions included on the booking sheet. Remarking that he would teach her a lesson, Frederick ordered that Mary be held in a holding cell. At approximately 4:00 p.m., Mary was released on bond after being booked on four counts: interfering with an officer; threatening an officer; simple battery; and simple escape.

### D. NEWS REPORT.

Sometime prior to noon that day, Frederick or someone at his direction notified the *Teche News*, the local weekly newspaper, of the arrest of Eugene, Jr. and Mary Thomas. The evidence shows that the paper is published on Wednesdays, and that the deadline for articles is noon on Tuesdays. September 16th was a Tuesday. The following day a newspaper article appeared with the headline, "Parks Candidate Charged with Passing Bad Checks." The article read in full:

> Eugene Thomas, 32, a candidate for the office of police chief in Parks in the coming election, has been arrested on theft charges.
>
> A spokesman for the St. Martin Parish Sheriff's Dept. said Thomas was arrested at his home around 9 a.m. Tuesday.

He has been booked with two counts of theft by fraud by issuing worthless checks.

Mrs. Verine Thomas, the candidate's mother, was also arrested at her son's home and, as of press time, was incarcerated in the St. Martin Parish Jail under $2,000 bond set by 16th Judicial District Court Judge C. Thomas Bienvenu.

Mrs. Thomas is charged with interfering with the duties of a police officer, simple escape, simple battery on a police officer, and threatening a police officer.

Judge Bienvenu set bond on Thomas at $500.

The newspaper account of the arrest of Eugene, Jr. and his mother appeared ten days before the election, and had a negative impact upon Eugene, Jr.'s candidacy. The extent of the impact can only be guessed. As noted, two-thirds of the 418 registered voters in the city limits of Parks were black. Despite an active campaign, Eugene, Jr. was defeated in the election by a vote of 202 to 104 (66% to 34%). This was a much poorer performance than in 1982, when Eugene, Jr. won 42% of the vote against the same opponent with little or no campaigning.

### E. BOOKING OF ADA WASHINGTON.

A day or two after the incident, Ada's husband, Ronald Washington, and her brother Michael Thomas saw Frederick with Gary Bienvenu at a local gas station. Frederick called Ronald over and told him to bring Ada in to the Sheriff's Office. When Ronald replied that he did not think he could because Ada was upset, Frederick stated that "the judge was talking about arresting the whole Thomas family." Following this exchange, Ronald took Ada in for booking on September 18, 1986. Ada was charged with three counts: interfering with an officer; simple battery on an officer; and resisting arrest.

### F. PROSECUTION OF THE THOMASES.

After Frederick arrested, charged, and booked the Thomases and arranged for

publication of the newspaper article, the matter was closed. Only after this civil rights suit was instituted over a year later did Sheriff Fuselier order that the charges against Eugene, Jr., Mary and Ada be sent to the D.A.'s office for prosecution. Frederick testified that it was up to him, as the "victim of the battery" to decide whether to prosecute Mary and Ada. No explanation was given for the delay in prosecuting Eugene, Jr. on the check charges. The Sheriff explained at trial that he was unaware that the charges had never been referred to the district attorney's office and that they should have been referred immediately after the incident.

Eugene, Jr. ultimately pled guilty to the charge of issuing worthless checks and was sentenced on March 21, 1989 to a $50 fine and one year probation.

Mary and Ada were found guilty on the charges against them following a trial in July, 1988. Although the convictions were based in part upon false testimony of Frederick and Pourciaux,[3] they either were not appealed, or the appeals were unsuccessful. Mary and Ada each served 15 days in jail.

### G. CREDIBILITY OF THE WITNESSES.

In making its findings of fact, the court has relied in large part upon the version of events testified to by the Thomas family, and discounted for the most part the testimony of Frederick and Pourciaux. Because the facts were hotly disputed by the parties, it was necessary to evaluate carefully the demeanor and the internal consistency of the testimony offered by each witness. The court would be remiss to omit a full discussion of its credibility findings.

Neither Frederick nor Pourciaux were credible witnesses at the trial of this matter. Their testimony was riddled with contradictions, inconsistencies and self-described "mistakes" in a number of areas. First, at the criminal trial against Mary Thomas in July, 1988, Frederick testified that he had prepared a report describing

3. See discussion "G" below entitled "Credibility of the Witnesses."

the incident with the Thomases on the day after it occurred, which would have been September 17, 1986. Three times he asserted that the report was dictated on the day following the incident, although he could not say when the secretaries typed it.

During the instant trial, Frederick finally admitted that the report was not prepared until after this civil rights suit was filed, over one year later. He testified that the report was prepared from "rough notes" contained in the file, although the notes were not produced.

Frederick also admitted that the report contained a number of errors and inconsistencies. For example, the report corroborates Mary Thomas' testimony that when Frederick and Pourciaux first parked in front of Eugene, Jr.'s house, they saw and spoke to Mary Thomas on the street. However, at the criminal trial and at the instant trial, Frederick emphatically denied that he spoke to Mary Thomas first. He testified that upon arriving at Eugene, Jr.'s home, he went to the front porch, knocked on the door and spoke to Eugene, Jr.'s wife, who then called Eugene, Jr. to the door. Only after this exchange did he see Mary Thomas coming down the street "mumbling" that Frederick "was not going to take her son." When confronted with this inconsistency at the trial of this case, Frederick simply stated his report was wrong and that he had been mistaken.

Frederick's testimony regarding the sequence of events was further undermined by the uncontroverted evidence that Eugene, Jr.'s wife was not home that morning, since she had gone to an early prayer meeting. Contrary to Frederick's testimony, she could not have answered the door that morning.

Frederick's report, though very detailed regarding the verbal exchanges between the Thomases and the deputy sheriffs, does not contain any evidence whatsoever that Mary Thomas in any way touched either officer before they allegedly arrested her. The report states that Mary Thomas was "hollering at Deputy Pourciaux and myself

to get away that we could not pick up her son (sic)." The report further states that after being warned, Mary Thomas continued to curse and exclaim that no one would pick up her son, and the following ensued:

> * * * That time she said some more curse words and was still coming towards me and Eugene Thomas, Jr. and there Mr. Pourciaux and myself advised her of her arrest for interfering with duties of an officer and as we grabbed her she starting fighting with us. I grabbed her right arm and Deputy Pourciaux grabbed the left arm and we brought her near the car and there while we were putting the cuffs on, trying to put the cuffs on her, I was hit on top of the head with some blunt object. I proceeded to pass out when Deputy Pourciaux caught me and brought me back up. * * * [4]

Both at the criminal trial and the instant trial, however, Frederick testified that in fact Mary Thomas was arrested only after she either "pushed" or "bumped" Frederick, although Frederick's testimony on this point is also contradictory. At the criminal trial, Frederick testified that Mary intentionally pushed him as she proceeded to walk between Frederick and the ditch. It was only after this event that he and Deputy Pourciaux "grabbed her by the arms and brought her to the car." [5] This testimony contributed in large part to Mary Thomas' conviction on simple battery charges.

At the instant trial, Frederick initially presented a slightly different version of events—that Mary accidentally "bumped" him as she tried to pass between him and the ditch. When confronted with this inconsistency, Frederick again waffled and claimed the testimony he had given at the criminal trial was the correct version.

Finally, Frederick testified that he decided to arrest Mary because her shouting was causing people to gather in the streets and he anticipated "a riot." He identified several neighbors he recalled seeing on the street at the time. The more credible testi-

---

4. See Plaintiff's Exhibit 10.

5. See Plaintiff's Exhibit 23, page 48.

mony showed, however, that most of the neighbors worked the 7:30 a.m. shift at Martin Mills, and were not home at the time.[6] Another person ostensibly present at the scene did not in fact move into the neighborhood until much later.[7] In fact, the evidence showed that the only people outside at the time of the incident were the two deputies, Mary Thomas and Ada Washington. The other members of the Thomas family who witnessed the incident were inside their homes.

Pourciaux's testimony was equally lacking in credibility. Pourciaux maintained at both trials that his report was prepared on September 17, 1986, the day after the incident. The evidence showed, however, that Pourciaux's report was based in large part on Frederick's report (which Frederick admitted was prepared over a year after the incident).

Although Pourciaux testified that he was not acquainted with the Thomases prior to the incident in question, his report repeatedly refers to Mary Verina Thomas as "Vernie." When cross-examined on this point, Pourciaux maintained that "Vernie" is what everyone called Mary Thomas. However, the uncontroverted evidence shows that Mary Thomas' middle name was "Verina", that she was often called "Vee," but that she was never known as "Vernie". In fact, the name "Vernie" appears in only one place in any document relating to this incident: Frederick's written report. Pourciaux was in the courtroom when Frederick testified that his report was prepared over a year after the incident, and that the reference to Mary Thomas by the name "Vernie" in his report was a typographical error. Faced with the inexorable implications of the evidence, Pourciaux nonetheless clung to his story, lamely offering that he had heard the name "Vernie" before, although he could not recall where.

**6.** Frederick testified that he saw Mr. and Mrs. Hibald on the street, but more credible testimony established that both of them had already gone to work.

**7.** Frederick initially identified "the Charles family" as being on the street at the time of the

Furthermore, Pourciaux's report is strikingly similar to Frederick's report in organization, content and selection of descriptive adjectives. It is abundantly evident that Pourciaux's report was based upon Frederick's, and contained the same "mistakes" admitted to by Frederick.

Finally, Pourciaux's report contains a description of the arrest of Ada Washington, and a recitation of the counts on which she was arrested. Since Ada Washington was not arrested or charged until September 18th, Pourciaux's testimony that his report was prepared on September 17th is patently false.

For the reasons stated, and because the court found both Frederick and Pourciaux to be unconvincing witnesses in almost all other respects, their testimony was largely discounted. The court accepted as true the version of events provided by Mary Thomas in a deposition prior to her death and at her criminal trial. This version is corroborated on all essential points by other credible eyewitnesses, including Ada Thomas Washington, Ronald Washington, Chameka Leon and Michael Thomas.

## H. SHERIFF FUSELIER'S ROLE.

Sheriff Fuselier took office in July, 1980 with no previous experience in law enforcement; his background was in civil engineering and construction. In 1980, new state standards were implemented requiring new sheriffs and deputies to complete training under a program entitled "Peace Officer's Standard in Training" (POST). Since Fuselier took office prior to the effective date of the standards, POST training for him was discretionary. He chose not to take it. He also chose not to require any deputies on the force prior to the effective date of the POST standards to undergo the training, including Frederick and Pourciaux.

incident. When confronted with the suggestion that the family did not move into the neighborhood until much later, Frederick contradicted himself and stated that he did *not* see any member of that family.

With respect to the facts of this case, Sheriff Fuselier could not recall a specific conversation with Mary Thomas, but admitted that she or someone else must have contacted him regarding the alleged incident, because he remembers talking to Frederick about it. After speaking with Frederick, the Sheriff decided that the allegations were "not serious" and took no action. He made this decision without the benefit of interviewing any witnesses other than Frederick, or obtaining any statements. He did not enter any notation or documentation of the incident in any records or personnel files. As noted above, Sheriff Fuselier also admitted that it was his decision to refer the year-old charges against the Thomases to the D.A.'s office after this civil rights action was filed.

Plaintiffs presented evidence of other alleged incidents of civil rights abuses committed by St. Martin Parish deputies to establish personal liability on the part of the Sheriff.

Defendants admitted that at least 15 civil rights cases have been filed against Sheriff Fuselier, deputies under his supervision, or both.[8] Sheriff Fuselier testified at trial that the allegations of these suits charge him and at least eight deputy sheriffs with brutality or other violations of civil rights. The court takes judicial notice that there is at least one additional case litigated in this court which inexplicably was not included in the defendant's list. (See No. 4 below involving Arthur Blanchard). Among the cases are the following:

(1) *Dalton Etienne.* In late November, 1986, Detective Eddie Romero requested Dalton Etienne, a black resident of St. Martinville, to come to the sheriff's office for questioning in connection with the recent murder of a white man. Etienne had previously been questioned and released. Before reporting once again for questioning, Etienne took the advice of his brother, a police officer for the City of Houston, and purchased a tape recorder to wear during the interview.

The resulting tape was admitted in evidence, and was played at the trial. The court also heard the testimony of Etienne and Romero.

The evidence shows that Etienne was brought into an interrogation room occupied by Romero and Roy Bonvillian, Chief of Detectives. After some initial questioning, Romero told Etienne that the deputies had a lot of evidence against him, including experts who would testify in court. He repeatedly stated "I'm going to tell you how you killed that old man" and asked Etienne why he was lying by denying his involvement in the crime. As Etienne continued to deny his involvement, Romero began shouting at Etienne, calling him a "motherfucker," and threatening to kill him. Romero then picked up an aluminum baseball bat and struck Etienne with it at least four times on the arms and shoulders. Romero's shouts of "come on motherfucker" and "I'll kill you, motherfucker" are interspersed with Etienne's screams of pain on the tape recording.[9] Romero continued to threaten Etienne, stating, "I ain't gonna put up with your smart black ass", and remarking that there was no one there to witness the events but Romero and Bonvillian.

Etienne was released following this violent interrogation, and was never implicated in the crime under investigation. He turned the tape over to the F.B.I., which conducted a civil rights investigation culminating in Romero's conviction of a misdemeanor following a guilty plea in this court in May, 1987. Romero was sentenced to

---

8. See Plaintiffs' Exhibit No. 22.

9. The ensuing civil rights complaint alleges that Etienne's brother was able to hear the shouts and screams from the hallway of the sheriff's office, where Russell Frederick also happened to be located. *See* complaint in C.A. 87–0533, attached hereto and made a part hereof by reference.* Since the case was settled, no adjudication of the truth of this allegation was ever made. However, the tape received into evidence indicates that the noise which accompanied Etienne's beating must have been audible outside the interrogation room unless it was soundproof.

* Editor's Note: With the Court's permission, attachments have been omitted from publication. The references are retained for purposes of the record.

pay a fine, serve one year probation, and perform 40 hours of community service.

In view of the FBI investigation, Sheriff Fuselier chose not to conduct his own investigation, nor were any state charges ever referred against Romero for the assault of Dalton Etienne. Sheriff Fuselier did suspend Romero for 30 days, placed him on non-detective duty for five months, and passed him over for promotion to Chief of Detectives. However, in January, 1990, the Sheriff promoted Romero to the higher rank of lieutenant.

Roy Bonvillian, Chief of Detectives, and Romero's supervisor, was present in the room while Romero verbally harassed, threatened, and then beat Etienne. Bonvillian did not appear surprised or shocked at Romero's actions. In fact, he observed the beating without voicing any objections or taking any action. After Romero struck Etienne for the fourth time, however, Bonvillian gave a hand signal to Romero to stop.

Sheriff Fuselier did not discipline Bonvillian or take any other action to correct his approach in the future. No notation of the incident was placed in Bonvillian's personnel file, although the Sheriff admitted at trial that a notation should have been made.

(2) *John and Clyde Boudreaux.* On March 7, 1985, Deputy Sheriff August "Butch" Dupuis stopped a vehicle occupied by John and Clyde Boudreaux for a routine traffic investigation. Dupuis decided at some point to arrest Clyde Boudreaux for resisting an officer, and in the course of the arrest he struck both Clyde and John Boudreaux in the head with a metal flashlight. He then shot Clyde Boudreaux in the stomach, causing him to lose a kidney. The Boudreauxs filed a federal civil rights action against Dupuis and Sheriff Fuselier

in March, 1986. The case settled before it went to trial for a sum of $120,000.[10]

Sheriff Fuselier testified that he did not discipline Deputy Dupuis because he "saw no reason to". When asked if Dupuis had made the first strike against the Boudreauxs, the Sheriff testified he did not know. The matter was presented to a local grand jury, which did not indict Dupuis. No written notation was placed in Dupuis' personnel file, although Sheriff Fuselier admitted that in instances where there is a written complaint, a report should be made.

(3) *Marilyn Michuta.* Marilyn Michuta was the owner and operator of the Larose Bar & Grill in St. Martin Parish, and it was in her parking lot that Deputy Dupuis beat and shot the Boudreaux brothers on March 7, 1985. Michuta, a witness to the shooting, was asked to come to the sheriff's department for questioning following the incident. As a result of her treatment at the Sheriff's office, Michuta filed a civil rights complaint against the Sheriff and several deputies.

Michuta alleged in her complaint that at the Sheriff's office substation she was ordered not to speak to one of her employees. When she responded that "she was a witness and not a suspect," a deputy sheriff named Durand yelled at her and threw her violently into a chair, resulting in injuries which required medical attention. The complaint alleges that Russell Frederick witnessed this incident and told Michuta that Durand would be disciplined, but that no disciplinary action or reprimand was ever given.

The evidence shows that the suit was settled for "nuisance value" prior to going to trial.[11]

(4) *Arthur J. Blanchard.* Blanchard filed a civil rights complaint against Sheriff Fuselier and Deputy Sheriff James Berger-

---

10. The basic allegations of the ensuing civil rights complaint were confirmed by Sheriff Fuselier at the trial of this matter. The court attaches hereto a copy of the complaint filed in C.A. 86–0429.*

  * Editor's Note: With the Court's permission, attachments have been omitted from publication. The references are retained for purposes of the record.

11. Plaintiff's Exhibit No. 22. A copy of the original complaint in that matter, C.A. 86–0507, is attached hereto for reference.*

  * Editor's Note: With the Court's permission, attachments have been omitted from publication. The references are retained for purposes of the record.

on on March 28, 1983. Although this case unaccountably was not included in the list provided by defendants in answer to plaintiff's interrogatories, the court takes judicial notice of the record of this court and the jurisprudence on appeal showing that defendants were found liable following a jury trial. A copy of the original complaint, the jury verdict form, and the judgment in C.A. 83–0755 is attached hereto.*

Blanchard's complaint alleged that on June 25, 1982, Deputy Bergeron attacked the plaintiff in a lounge and beat him in the face and stomach with a blackjack, resulting in a broken jaw and other severe injuries. The case was tried before a jury, which found that Blanchard was without fault and that Deputy Bergeron used excessive force against him. It held Bergeron personally liable and Sheriff Fuselier liable in his official capacity for the injuries suffered by Blanchard. Plaintiff was awarded $5,000 in compensatory damages, $5,000 in punitive damages, attorney's fees and costs. Judgment was entered pursuant to the verdict, and no appeal was taken from the damage award.[12]

The court makes no findings of fact as to the allegations in these civil rights cases other than those matters established at the instant trial, or established as the result of another adjudication, as discussed above. However, the court notes that the allegations of such previous suits are admittedly known to Sheriff Fuselier, and place into context his overall supervisory approach to training, discipline and investigation of allegations of civil rights abuses visited by his deputies upon citizens, and his specific approach in this case.

Sheriff Fuselier testified that in 1986 he employed 80 people, only 20 to 25 of whom were patrol deputies.[13] He testified that upon receiving a complaint or other information alleging civil rights violations, it was his practice to assign the matter to a supervisor for investigation or to handle it himself. However, there was no evidence presented that Fuselier had ever conducted an investigation regarding any of the allegations of police brutality or civil rights violations discussed above, or that he had assigned a supervisor to do so.

In the instant case, the Sheriff admitted that he did not investigate the allegations made against Frederick and Pourciaux, obtain any statements, interview any witnesses other than the deputies involved, or make a notation in any personnel file. It was clear from the Sheriff's testimony he does not have even the most rudimentary procedure for investigating or documenting incidents of police brutality. Rather, time after time his approach has been to turn a blind eye to allegations of misconduct and abuse on the part of his deputies. Despite adverse outcomes in civil and criminal cases such as *Etienne, Blanchard,* and *Boudreaux,* the Sheriff continues to give unquestioned credence to the version of events presented to him by his deputy sheriffs, and is satisfied to leave serious allegations of police misconduct virtually uninvestigated. The court concludes that the Sheriff's approach contributed to an atmosphere in which unconstitutional behavior among his deputies was tolerated and, in fact, virtually encouraged.

## I. INJURIES.

*1. Mary Thomas.* Immediately following the incident, Mary Thomas called her treating physician, Dr. Cindy Lessinger, and obtained an appointment for the next day. The notes of that visit show that Mary complained of severe back and neck pain, reporting a history of being "thrown backward against a car by policemen yesterday." Dr. Lessinger prescribed a cervical collar, medication and bed rest. She continued to treat Mary conservatively for approximately ten months, when she left her local practice.

In July, 1987, Mary began seeing Dr. Barton Chase for continuing neck and back

---

**12.** Only the award of attorneys' fees was appealed. *See Blanchard v. Bergeron,* 831 F.2d 563 (5th Cir.1987); *reversed,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *on remand,* 893 F.2d 87 (5th Cir.1990).

**13.** The remaining employees were predominantly employed in the tax collection and civil process divisions.

pain. Dr. Chase also prescribed conservative treatment, including physical therapy. On September 23, 1987, the physical therapist noted that Mary also complained of pain and numbness in her left arm.

X-rays taken in October of 1987 revealed narrowing of the disc spaces at L4–5 and L5–S1. A CT scan in March, 1988 revealed a disc herniation at L5–S1 and bulging discs at L3–4 and L4–5. Dr. Chase referred Mary to Dr. John E. Cobb, an orthopedic surgeon.

Dr. Cobb treated Mary between August 8, 1988 and June 27, 1990. He treated Mary's neck pain conservatively, and this problem apparently resolved itself by November, 1988.

Mary was hospitalized for two days in September, 1988 for a myelogram to help determine the cause of her continued back pain. The test revealed a disc herniation at L4–5. In addition, nerve conduction studies showed an ulnar nerve lesion at the left elbow.

In October, 1988, Mary was hospitalized for 10 days during which she underwent surgery for excision of the L4–5 disc and a fusion from L4 to the sacrum. For approximately six months following surgery, Mary wore a lumbar corset, used a walker, and took pain medications. The record shows that she continued to have back pain of varying degrees until her death from cancer in October, 1990.

Defendants argue that Mary had a previous history of neck and back pain, and that she suffered from degenerative disc disease. Defendants also argue that Mary denied having these previous problems in a pretrial deposition, and that her testimony is therefore not credible.

Mary testified in her deposition that she was involved in an automobile accident in February, 1977 which resulted in an inner ear problem and related neck pain. The neck pain resolved itself in 1978 following surgery to reconstruct her middle ear bones. Mary also admitted that she had experienced previous back pain which was related to kidney problems. Defendant's claims that Mary denied these problems is unsupported by the record.

The medical records show that Mary had isolated complaints of back pain in May, 1978, July, 1983 and July, 1984. A handwritten note dated January 2, 1986 seems to read, "patient in because of swollen right hand and having her back and twisted right knee." X-rays of the knee and hand were ordered. The reference to "back" is ambiguous and in view of the diagnostic tests ordered, I conclude that this did not involve an incident of back pain. Tests conducted after the incident, however, show that Mary suffered from degenerative disc disease in addition to the disc problems already noted.

In summary, I conclude that prior to September 16, 1986, Mary had degenerative disc disease, a common condition in people her age (47). However, the condition was essentially asymptomatic and Mary had no back problems for at least two years prior to the incident in question. The great weight of the evidence, particularly the testimony of Dr. Cobb, establishes that Mary began suffering persistent and severe back pain immediately after the incident with Frederick. The etiology of the pain was finally diagnosed as a herniated disc which required two periods of hospitalization to diagnose and correct.

With respect to Mary's complaints of neck pain, the medical evidence shows that Mary had frequent complaints of neck pain in the past which may or may not have been related to her ear problems. I conclude that the incident in question aggravated a pre-existing neck condition, causing Mary to suffer more neck pain and disability than she would have otherwise.

Regarding the ulnar nerve lesion diagnosed in September, 1988, I conclude that the evidence is insufficient to establish a causal connection between this condition and the incident in September, 1986. There are no complaints of arm pain or numbness in the medical record until over one year following the incident. The medical testimony indicates that the symptoms of an ulnar nerve lesion normally appear within several months of the trauma which caused it.

2. *Ada Thomas Washington.* The week before the incident with Frederick, Ada had been released from a mental hospital where she had been treated for manic-depressive illness. Ada suffered no physical injuries as a result of the incident, but she experienced mental anguish and emotional distress as a result of witnessing the use of excessive force against her mother. In addition, the subsequent newspaper account of the arrest of her mother and brother, and her prosecution on charges a year later, caused her embarrassment, humiliation and further mental distress. In September, 1989, Ada attempted to commit suicide. She testified that this attempt followed a period of depression over her conviction and an inability to find a job (which she attributed to the conviction).

3. *Eugene Thomas, Sr. and Eugene Thomas, Jr.* The extent of the mental and emotional injuries claimed by these plaintiffs need not be addressed here. For reasons discussed below, I find there are no legal bases for their claims of recovery.

## III. CONCLUSIONS OF LAW

### A. GENERAL

Federal question jurisdiction in this case is properly founded on 28 U.S.C. §§ 1331 and 1343. Pendant jurisdiction is appropriate for the state law claims since those claims arise from a "common nucleus of operative facts." *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### B. FEDERAL LAW CLAIMS UNDER § 1983.

■ In order to prevail in a civil rights action under § 1983, the plaintiffs must prove by a preponderance of the evidence that the conduct of the defendants was under the color of state law, and that the conduct resulted in a deprivation of rights, privileges, and immunities secured by the United States Constitution or a federal statute or both. *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (*overruled on other grounds, Dan-*

*iels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

### 1. Excessive Force

Defendants do not contest that they were acting under color of state law at the time of the incident on September 16, 1986 or thereafter. Thus, in order to establish liability under § 1983, plaintiffs must prove by a preponderance of the evidence that they were deprived of their constitutional rights by the defendants.

■ Claims that a law enforcement officer used excessive force in the course of making an arrest, investigatory stop, or other "seizure" must be analyzed under the Fourth Amendment's "objective reasonableness" standard:

> * * * Today we make explicit what was implicit in [*Tennessee v.*] *Garner's* [471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1] analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. * * *

*Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).

■ Although I find that neither Frederick nor Pourciaux attempted to arrest Mary Thomas in front of Eugene, Jr.'s home, Frederick in fact subjected her to a "seizure" within the meaning of the Fourth Amendment. *Id.,* 490 U.S. at 395, n. 10, 109 S.Ct. at 1871, n. 10 ("A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen,' *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968); *see Brower v. County of Inyo,* 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989)").

■ Following *Graham,* the 5th Circuit set forth the requisite elements of an ex-

cessive force claim in *Johnson v. Morel*, 876 F.2d 477 (5th Cir.1989):

(1) a significant injury, which

(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was

(3) objectively unreasonable.

*Id.* 876 F.2d at p. 480.

Applying these standards to the facts at hand, I find that plaintiffs have sufficiently proven the first element. The Fifth Circuit has held that a bruised thigh and a sore jaw were sufficient to state a significant injury under the *Johnson* standard. *Hay v. Irving*, 893 F.2d 796 (5th Cir.1990). Mary Thomas suffered a severe back injury requiring two periods of hospitalization and major surgery for a disc excision and fusion. In addition, she suffered aggravation of a pre-existing neck problem. Her injuries were clearly "significant."

With respect to the second element, plaintiffs must prove that the force used by Frederick was not only excessive, but "clearly excessive to the need." The facts show that the only threat Mary Thomas presented to Frederick was the force and logic of her argument that Eugene, Jr.'s bank account was not and had not been closed. The bank documents she showed Frederick essentially robbed him of probable cause to arrest Eugene, Jr. As much as Frederick may not have liked the situation, it did not justify his use of physical force against Mary Thomas. The severity of Mary's resulting injuries indicate that Frederick threw her quite forcefully against his car. I find the force used was "clearly excessive to the need."

The third element requires a showing that the use of excessive force was objectively unreasonable. *Graham* provided the following guidance in assessing the reasonableness of the use of force:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio, supra* at 20–22, 88 S.Ct. at 1879–1881. * * * With respect to a claim of excessive

force, the same standard of reasonableness at the moment applies: "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d [1028] at 1033, [(CA2)] violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham, supra*, 490 U.S. at p. 396–397, 109 S.Ct. at p. 1872 (1989).

Giving Frederick every benefit of the doubt, and according him the allowances required by *Graham*, there simply is no question that his use of force against Mary Thomas was objectively unreasonable in the context in which it took place. Frederick's testimony that he and Pourciaux each grabbed one of Mary's arms in order to effectuate an arrest, and that she fought them, was simply not believable. Frederick's justification for the alleged arrest was that he wanted to get control of Mary because a "riot" was about to occur in the black neighborhood. As discussed above, the evidence showed that the neighbors were at work at the time. Finally, Frederick was well-acquainted with the Thomas family and knew that they were law-abiding citizens who posed no threat to his safety or security. Mary Thomas was unarmed and made no aggressive move which would have justified Frederick's actions. Plaintiffs clearly have made the required showing under *Johnson*.

Since Frederick was the only officer involved in the altercation with Mary Thomas, it is clear that he is personally liable for the use of excessive force against Mary Thomas.

■ Plaintiffs allege that Deputy Pourciaux is individually liable for his failure to act when Deputy Frederick threw Mary Thomas against the car and held her there. As noted above, plaintiffs have proven by a preponderance of the evidence that Pour-

ciaux observed these events without responding.

■ Police officers have an affirmative duty to enforce the law, and are obliged to prevent fellow officers from violating a citizen's constitutional rights. Where he fails to do so, the observing officer is jointly liable to the victim. *Gagnon v. Ball,* 696 F.2d 17 (2nd Cir.1982); *Ware v. Reed,* 709 F.2d 345, 353 (5th Cir.1983); *Archie v. Racine,* 826 F.2d 480 (7th Cir.1987); *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir. 1982); *cert. denied* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983).

While the encounter between Frederick and Mary Thomas was brief, the evidence is clear that Pourciaux made no attempt to intervene before, during, or after it occurred. Under the standards enunciated above, Pourciaux is liable for the excessive force used against Mary Thomas under § 1983.

### 2. Liability of Sheriff Fuselier.

■ Sheriff Fuselier may not be held liable under § 1983 absent a showing of some wrongful behavior on his part; there is no respondeat superior liability under § 1983. The question is whether the Sheriff, through his own action or inaction, subjected plaintiffs to a deprivation of federally-protected rights. In evaluating a supervisor's liability for violation of federally-protected rights, one must first determine whether federal or state law imposed a duty upon the supervisor to act, and whether the supervisor breached that duty. *Reid v. Kayye,* 885 F.2d 129, 132 (4th Cir.1989); *O'Quinn v. Manuel,* 773 F.2d 605, 608–09 (5th Cir.1985).

■ In the instant case, there is no dispute that Sheriff Fuselier was directly charged with the supervision of his deputies. Louisiana Civil Code Article 331 provides as follows:

Art. 331. Deputy Sheriffs and Other Employees.

Except as otherwise provided by law, a deputy sheriff possesses all of the powers and authority granted by law to the sheriff, and may perform any of the duties and exercise any of the functions of the sheriff.

Deputy sheriffs and other employees of the sheriff are subject to his direction and supervision, and shall perform the duties assigned to them by law, and by the sheriff.

The sheriff is responsible for the performance or non-performance of their official duties by his deputies and other employees.

Louisiana courts have also recognized the supervisory role of the Sheriff with respect to his deputies:

The sheriff, and not the state, hires and fires deputies, exercises a direct and indirect supervision and control over them, fixes their time and place of work, and generally allocates their responsibility and assigns their duties. Although the money for the operation of the various sheriff's departments may come from various sources of public funds (primarily fees as tax collector and in civil and criminal matters), the sheriffs disburse the allocated funds and actually pay most of the salaries of the deputies with these funds. No one but the sheriff can realistically be viewed as the employer of the deputies. * * *

*Jenkins v. Jefferson Parish Sheriff's Office,* 402 So.2d 669, 671 (La.1981); *see also Nall v. Parish of Iberville,* 542 So.2d 145 (La.App. 1st Cir.1989).

I conclude that Sheriff Fuselier had a duty under state law to supervise his deputies in all aspects of their performance, including the manner in which they observed, or failed to observe, constitutional standards in carrying out their duties.

The Second Circuit, in *Williams v. Smith,* 781 F.2d 319, 323–24 (2nd Cir.1986), held that supervisory liability may be imposed where the supervisor: (1) directly participated in the event; (2) failed to remedy a wrong after learning of it; (3) creates "a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue;" or (4) is "grossly negligent in managing subordinates who caused the unlawful condition or event." *Id.,* 781 F.2d at p. 323–324. *See*

also *LeDomicile, Inc. v. Louisiana,* 674 F.Supp. 546 (E.D.La.1987). The Supreme Court's decision in *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) now requires that the "grossly negligent" standard in No. 4 be replaced with the words, "deliberately indifferent."

It should be noted that supervisors cannot be held liable under § 1983 for mere negligence and failing to detect and prevent misconduct of their subordinates, since negligence is no longer culpable under § 1983. *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Jones v. Chicago,* 856 F.2d 985 (7th Cir.1988). Gross negligence is also insufficient.

> * * * The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate reckless indifference. * * *

*Id.,* 856 F.2d at p. 992–993 (citations omitted).

■ In the instant case, it has been well-established that repeated and widespread abuses have occurred in the St. Martin Parish Sheriff's Department, that these abuses have been brought to the attention of Sheriff Fuselier, and that he has repeatedly failed to respond to them in even the most minimal fashion. The Sheriff admitted that he failed to document the incident of proven police brutality inflicted upon Dalton Etienne, excusing this lapse by claiming deference to the F.B.I. investigation. This would be plausible except for the fact that the federal investigation apparently did not focus upon the role played by Roy Bonvillian and other deputies who may have been within earshot of the violence against Etienne, and who did nothing. It is shocking to contemplate the ramifications of this lapse—that the brutality inflicted upon Etienne was an accepted, perhaps routine, practice in difficult investigations.

Bonvillian, serving as Chief of Detectives, merely stood by and watched as Detective Romero beat a citizen with a baseball bat. Despite this admitted fact, Sheriff Fuselier conducted no internal investigation, took no disciplinary action against Bonvillian, and made no notation of the incident in Bonvillian's personnel file.

> A supervisor's continued inaction in the face of documented widespread abuses ... provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

*Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir.1984), *cert. denied* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

I conclude that Sheriff Fuselier is personally liable for the use of excessive force against Mary Thomas on September 16, 1986 under the standards enunciated above. This conclusion is based upon a finding that (1) Sheriff Fuselier failed to remedy the wrong after learning of it; (2) created a policy or custom which tolerated unconstitutional practices, and (3) was deliberately indifferent in managing his subordinates.

### 3. The Bystander Rule

■ Under the standards of *Johnson, supra,* a plaintiff must first establish a significant injury to recover for a claim of excessive force. In the instant case, no plaintiff has established a significant injury other than Mary Thomas.

■ Furthermore, it is well-established that a civil rights claim must be based upon a violation of a plaintiff's personal rights. A bystander who witnesses a police action, but who is not himself an object of that action, cannot recover for any resulting emotional injuries under § 1983, although there may be such a claim under state tort law. There is no constitutional right to be free from witnessing police action. *Grandstaff v. Borger,* 767 F.2d 161, 172 (5th Cir.1985), *cert. denied* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). *See also Coon v. Ledbetter,* 780 F.2d 1158 (5th Cir.1986); *Archuleta v. McShan,* 897 F.2d 495 (10th Cir.1990).

Plaintiffs argue that Ada Washington was a participant and not a bystander, since it was her action in striking Frederick over the head with her fist that caused him to release Mary Thomas from his use of excessive force. Plaintiffs offer no support for this position, and the court can find none. There simply is no showing that Ada's personal constitutional rights were violated.

Since no other plaintiff can show a significant physical injury, and there is no authority for finding § 1983 liability based solely upon an emotional injury[14], all other federal claims of the plaintiffs fail.

#### 4. Other § 1983 Claims

Although plaintiffs set forth a number of § 1983 claims in their complaint, the evidence at trial and plaintiffs' post-trial briefs focused almost exclusively on the issue of the use of excessive force against Mary Thomas. This limited focus was appropriate, since the court concludes, as plaintiffs must have, that the elements of proof as to other constitutional claims are not present.

■■■ First, plaintiffs have failed to show that Mary Thomas' detention following her arrest was unreasonable per se. The evidence shows that Mary Thomas refused to provide certain information requested in the booking procedure, and that this lengthened her stay at the sheriff's department to approximately five hours. That Frederick may have had an evil motive in extending her detention is not relevant absent a showing that there was an actual deprivation of constitutional rights. In *McConney v. Houston*, 863 F.2d 1180, 1185 (5th Cir.1989), the Fifth Circuit held that a person may constitutionally be detained for at least four or five hours following a lawful arrest for public intoxication without any affirmative duty on the responsible officers to determine whether the detainee is still intoxicated. *See also Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir.1988)

(holding that an 11–hour detention following a determination of mistaken identity was not per se a violation of constitutional rights, and that a reasonable time is allowed for carrying out administrative tasks incident to release).

■■■ Second, any claims of Eugene, Jr. for false arrest or malicious prosecution also fail under § 1983. There is no constitutional violation when a valid warrant or probable cause supports an arrest, regardless of the motives of the arresting officer. *Smith v. Gonzales*, 670 F.2d 522 (5th Cir. 1982), *cert. denied* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982); *Mark v. Furay*, 769 F.2d 1266 (7th Cir.1985). In *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir.1989), the court stated:

> Regardless of the defendants' motives toward the plaintiff, the existence of probable cause for an arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution.... If, however, the finding of probable cause is based on the defendants' intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of an arrest.

*Id.* 875 F.2d at p. 582. In the instant case, it is clear that the checks provided to Frederick by Courville were grounds for the issuance of the arrest warrant, regardless of Frederick's underlying bad motives. Plaintiffs might have argued, but did not, that Frederick's actions constituted the tort of abuse of process. Even so, it is questionable whether this tort can rise to constitutional dimensions under § 1983 as can false arrest and malicious prosecution.

■■■ Third, neither Eugene, Jr., Mary, nor Ada can maintain an action for malicious prosecution under § 1983. The elements of malicious prosecution are generally the same under § 1983 as under state tort law. *Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34

---

**14.** *See Johnson v. Morel,* 876 F.2d 477, 480, fn. 1 (5th Cir.1989) which states "We think it unlikely that such a significant injury will be caused by unnecessary force without significant *physical* injury. However, on the facts before us here, we do not decide whether a significant but nonphysical injury would be legally sufficient."

(2nd Cir.1985), *cert. denied* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337. In order to maintain an action for malicious prosecution, a plaintiff must show that the criminal proceeding in question was terminated in his or her favor. A criminal conviction is a bar to the action for false arrest or malicious prosecution, even though there is an unexercised right of appeal, and even where the conviction was obtained by perjury or other fraud upon the court. *See Prosser Handbook of the Law of Torts*, 4th Ed. at p. 838 (1971). As noted above, Eugene, Jr. pled guilty to two counts of issuing worthless checks. Mary and Ada were convicted after trial, and their convictions were not overturned.

In conclusion, other than the § 1983 claim of Mary Thomas, no other plaintiff has established a § 1983 claim against the defendants.

### 5. Qualified Immunity

■ All defendants are entitled to qualified immunity against money damages as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This immunity does not protect any defendant who knowingly violates the law. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ There is no question that defendants are not entitled to qualified immunity. At the time of Mary Thomas' encounter with Deputy Frederick, her Fourth Amendment right to be free from the use of excessive force in the course of an arrest or seizure was clearly established. Both deputies who were present at the scene, and Sheriff Fuselier, whose custom and policies tolerated such abuses, cannot be shielded by qualified immunity doctrines.[15]

### C. STATE LAW CLAIMS.

In addition to their federal law claims, plaintiffs assert the state law torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery. Ordinarily there would be no reason to discuss these claims since the defendants have been found liable under § 1983, and Louisiana tort remedies would add nothing to the remedies already available under § 1983. However, plaintiffs seek to impose liability on Sheriff Fuselier not only in his personal capacity under § 1983, but also in his official capacity under the doctrine of respondeat superior under state tort law.

Furthermore, the claims of plaintiffs other than Mary Thomas, which have been rejected under § 1983, bear scrutiny under the alternative principles of state tort law.

■ Louisiana has long recognized a cause of action under Civil Code Article 2315 for intentional infliction of emotional distress. In order to recover, a plaintiff must prove by a preponderance of the evidence that the defendant, by extreme and outrageous conduct, caused emotional distress either intentionally or with the realization to a virtual certainty that mental anguish will occur. *White v. Monsanto Co.*, 570 So.2d 221 (La.App. 5th Cir.1990); *Bienvenu v. Foti*, 567 So.2d 818 (La.App. 3rd Cir.1990). *See also Moresi v. Louisiana*, 567 So.2d 1081 (La.1990) and cases cited therein.

■ Applying these standards to the instant case, I find that Frederick is liable for intentional infliction of emotional distress as to both Mary Thomas and Ada Washington. Frederick's conduct was clearly "outrageous" and was undertaken with the "realization to a virtual certainty" that his actions would bring mental anguish to Mary and any members of her family who witnessed them. Frederick was particularly aware of Ada's presence, since she was shouting at him to let her mother go.

---

**15.** The court notes that the defendants neither raised this issue at trial nor briefed it to the court.

Since neither Eugene, Sr. nor Jr. witnessed the event, their claims for intentional infliction of emotional distress must fail.

■ Frederick is also liable under Louisiana tort law for all damages caused by his use of excessive force against Mary Thomas. The Louisiana Supreme Court has held:

> The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result, LSA–C.C. Art. 2320; *Picou v. Terrebonne Parish Sheriff's Office*, La.App., 343 So.2d 306 (1977), writ refused, La., 345 So.2d 506 (1977); *Cheatham v. Lee*, La.App., 277 So.2d 513 (1973); *Bourque v. Lohr*, La.App., 248 So.2d 901 (1971); *Taylor v. City of Baton Rouge*, La.App., 233 So.2d 325 (1970).

*Kyle v. New Orleans*, 353 So.2d 969, 972 (La.1977).

Under Louisiana jurisprudence, the court must determine whether the force used was reasonable by considering the totality of the facts and circumstances of each case. The court must evaluate the officer's actions against those of the "ordinary, prudent and reasonable man placed in the same position with the same knowledge as the officer." *Evans v. Hawley*, 559 So.2d 500 (La.App. 2nd Cir.1990), *cert. den.* 563 So.2d 1156 (La.1990). The factors include the known character of the arrestee; the risks and dangers faced by the officer; the nature of the offense or behavior involved; the chance of escape if the particular means are not employed; the existence of alternative methods of arrest or subduing the arrestee; the physical size, strength and weaponry of the officers as compared to that of the arrestee; and the exigencies of the moment. *Id.; see also Kyle, supra.*

Taking into consideration all of the factors involved, I conclude that Deputy Fuselier is liable under Louisiana tort principles for damages emanating from his use of excessive force against Mary Thomas.

■ Sheriff Fuselier is responsible under the doctrine of respondeat superior for the torts of his deputies. *Nall, supra*, 542 So.2d 145; *Chance v. Louisiana*, 567 So.2d 683, n. 2 (La.App. 3rd Cir.1990). The Sheriff is therefore liable in his official capacity for all damages suffered by Mary Thomas and all emotional injuries suffered by Ada Washington proximately caused by Frederick's torts.

## IV. DAMAGES.

Damage awards under § 1983 are "intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." *Owen v. Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 1416, 63 L.Ed.2d 673 *reh. den.*, 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980). Generally, three types of damages are awardable: actual or compensatory damages, nominal damages, and punitive damages. *Memphis Community School District v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 2542–43, 91 L.Ed.2d 249 (1986). *See also Carey v. Piphus*, 435 U.S. 247, 256–57, 98 S.Ct. 1042, 1048–49, 55 L.Ed.2d 252 (1978). Since the court finds recovery of both compensatory and punitive damages is appropriate, there is no need to discuss nominal damages.

### A. COMPENSATORY DAMAGES.

■ As discussed above, Mary Thomas and Ada Thomas Washington are entitled to recover damages in this suit. Compensatory damages should include both special damages such as medical expenses, loss of wages, and lost future earnings as well as general damages for pain and suffering and emotional and mental distress. *Stachura, supra*, 477 U.S. at 307, 106 S.Ct. at 2543. Under Fifth Circuit jurisprudence, pain and suffering and mental anguish are not separate items of damage, and should be compensated for in a lump sum. *Fowler v. Carrollton Public Library*, 799 F.2d 976 (5th Cir.1986). The Fifth Circuit also instructs:

> Emotions are intangible but they are nonetheless perceptible. The hurt done

to feelings and to reputation by an invasion of constitutional rights is no less real and no less compensable than the cost of repairing a broken window pane or damaged lock. Wounded psyche and soul are to be salved by damages as much as the property that can be replaced at the local hardware store.

*Baskin v. Parker,* 602 F.2d 1205, 1209 (5th Cir.1979).

■ The evidence shows that Mary Thomas incurred medical bills totaling $20,764.91. A small portion of this amount, $206.00, relates to the ulnar nerve lesion.[16] Since the court finds that this injury cannot reasonably be attributed to the incident in question, this charge cannot be recovered. The survivors of Mary Thomas are entitled to recover $20,558.91 for past medical bills.

Mary Thomas was unemployed and on social security disability as a result of Meniere's disease at the time of the incident. Therefore, there is no claim for loss of wages and lost future earnings.

As noted above, Mary Thomas underwent two periods of hospitalization, one for a myelogram and the second for a serious back operation including a fusion. The record also shows that Mary Thomas' injuries caused her severe recurring back pain from September 16, 1986 until her death in October, 1990. I find that the heirs of Mary Thomas are entitled to recover $150,000.00 for her past pain and suffering, mental anguish, emotional distress, embarrassment, and humiliation.[17]

As discussed above, Mary Thomas' award of damages is against Deputies Frederick and Pourciaux in their individual capacities, and against Sheriff Fuselier in both his individual and his official capacities.

■ Ada Thomas Washington is entitled to recover damages for any emotional distress and mental anguish proximately caused by Frederick's outrageous conduct

on September 16, 1986, as discussed above. The record shows that Ada had recently been released from a mental hospital, and that witnessing the use of excessive force against her mother aggravated her mental condition for quite some time afterward. She attempted to commit suicide in September of 1989 as a result of depression, her inability to find work, and her belief that the criminal conviction rendered her unemployable.

As discussed above, Ada cannot recover for false arrest or malicious prosecution, and is therefore not entitled to recover damages for mental distress attributable to her prosecution or conviction. However, there is sufficient evidence to show that Ada suffered mental anguish immediately following and solely related to the incident which occurred on September 16, 1986. Damages for this mental anguish are awardable. The court finds that an amount of $5,000.00 is adequate to compensate Ada Washington for this claim.

Ada's recovery is against Frederick personally and against Sheriff Fuselier in his official capacity under the doctrine of respondeat superior.

### B.  SURVIVAL OF CLAIMS.

■ Defendants do not dispute that Mary Thomas' claim for compensatory damages under § 1983 and under Louisiana tort law survive her death under La.C.C. Art. 2315.1. Defendants do dispute, however, that her claims for punitive damages and attorney's fees survive.

Federal law does not address the issue of survivorship of § 1983 claims. Title 42 U.S.C. § 1988 provides that where federal law is deficient, the court should look to state law to the extent it is "not inconsistent with the Constitution and laws of the United States." In *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56

---

**16.**  See Plaintiff's Exhibit No. 7.

**17.**  This amount is based upon a consideration of amounts recovered both in Louisiana state courts for similar injuries, and in § 1983 cases involving excessive force. *Johnson v. Dixon,* 457 So.2d 79 (La.App. 4th Cir.1984), *cert. den.*

462 So.2d 196 (La.1984); *Andrews v. Mosley Well Service,* 514 So.2d 491 (La.App. 3rd Cir. 1987), *cert. den.* 515 So.2d 807 (La.1987); *Hall v. Ochs,* 817 F.2d 920 (1st Cir.1987); *Pressey v. Patterson,* 898 F.2d 1018 (5th Cir.1990).

L.Ed.2d 554 (1978), the Supreme Court specifically held that state law should be applied to resolve survivorship issues under 42 U.S.C. § 1988, unless state law is inconsistent with § 1983.

Louisiana law does not provide for punitive damages in a case such as the one at bar. Without a claim in the first place, survivorship becomes a moot point according to defendants. In *Ricard v. Louisiana,* 390 So.2d 882 (La.1980), the Louisiana Supreme Court declined to permit recovery of punitive damages in § 1983 actions instituted in the state courts. In reaching this result, however, the *Ricard* court relied in large part upon its interpretation of *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The *Ricard* court read *Carey* as disapproving of punitive damages in § 1983 cases and holding that compensatory damages are an adequate remedy. *See Ricard,* 390 So.2d 882 at 884. However, the U.S. Supreme Court subsequently decided *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), specifically holding that punitive damages are recoverable in certain § 1983 cases. Furthermore, even if *Ricard* were still viable law, it is not controlling in this court.

Under the plain language of § 1988, state law controls only if it is "not inconsistent with the Constitution and laws of the United States." Where application of state law is incompatible with § 1983's policies of providing compensation for violations of civil rights and preventing abuses of power by state and local officials, it will not control. *Robertson, supra.* The availability of punitive damages is central to the goal of deterrence inherent in § 1983 cases. *Zarcone v. Perry,* 572 F.2d 52 (2nd Cir. 1978). While the Fifth Circuit has not ruled directly on this issue, other courts have held that punitive damages may be awarded in § 1983 suits in federal courts even where they are not available under state law. *Gordon v. Norman,* 788 F.2d 1194, 1199 (6th Cir.1986). In *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984), the Seventh Circuit allowed recovery of punitive damages in favor of the plaintiff's estate even though Wisconsin law would

not allow such recovery. The court observed:

> To disallow punitive damages in section 1983 actions solely on the basis of restrictive state tort law would seriously hamper the deterrence effect of section 1983

*Id.,* 746 F.2d at p. 1241. In *Larson v. Wind,* 542 F.Supp. 25 (N.D.Ill.1982), the court observed:

> [In a previous case] Judge Merhige correctly identified deterrence as a major policy underlying § 1983. Other courts have held punitive damages may be awarded under § 1983 where defendants act with the malicious intention to deprive a person of his rights.... That sort of *conscious behavior* is most susceptible to being deterred by the award of punitive damages. This court therefore agrees with the *O'Connor [v. Several Unknown Correctional Officers,* 523 F.Supp. 1345 (E.D.Va.1981)] conclusion: section 1983's purpose of deterrence would be subverted by slavish application of a state survivorship rule denying punitive damages.

*Id.,* 542 F.Supp. at p. 27 (emphasis in original).

For the foregoing reasons, I conclude that Mary Thomas' claims for attorney's fees and punitive damages survive her death, for to do otherwise would be to subvert a major purpose of § 1983.

### C. PUNITIVE DAMAGES.

A plaintiff may recover punitive damages under § 1983 against a defendant in his individual capacity if the defendant's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Even when such a showing is made, the trier of fact must exercise discretion, weighing the nature of the defendant's conduct, the wisdom of pecuniary punishment, and the advisability of a deterrent. *Fairley v. Jones,* 824 F.2d 440 (5th Cir.1987). Recovery of punitive damages may be had

against both subordinate as well as supervisory officials. Where a supervisor has been shown to be deliberately indifferent in carrying out his disciplinary obligations, punitive damages are justified. *Gutierrez–Rodriquez v. Cartagena,* 882 F.2d 553 (1st Cir.1987).

▆ In the instant case, I find that Mary Thomas is entitled to recover punitive damages against both Frederick and Fuselier in their individual capacities. As discussed in detail above, Frederick's conduct from the outset was based upon the evil motive of discrediting Eugene, Jr. in his campaign efforts. When Mary Thomas confronted him with documentary evidence which challenged Frederick's probable cause for the arrest, Frederick recklessly and callously trampled upon Mary Thomas' constitutional right to be free from use of excessive force. *See Soderbeck v. Burnett County,* 752 F.2d 285, 289 (7th Cir.), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985).

Sheriff Fuselier failed to go through even the procedural motions of carrying out his disciplinary obligations, much less did he have any real objective of finding the truth in connection with this, previous or subsequent incidents of police misconduct. *Cartagena, supra.* Furthermore, his behavior constituted "reckless or callous indifference" to the constitutional rights of Mary Thomas. *Smith,* 461 U.S. at 56, 103 S.Ct. at 1640.

Based upon the foregoing, and carefully considering the nature of their actions, I find that Frederick and Fuselier are liable to the survivors of Mary Thomas for punitive damages in the amount of $15,000.00 each.

The survivors of Mary Thomas are also entitled to recover attorney's fees under 42 U.S.C. § 1988. A formal, itemized request for such fees shall be submitted within 30 days of the entry of this ruling.

## V. CONCLUSION.

The observation of Judge Tom Stagg in a previous civil rights case is apt:

In the quiet chambers of judicial decision-making, where lies are made of brick and truth composed only of feathers, this case involved the weighing of very few feathers in the search of a preponderance of truthful evidence, and involved discovery of enough bricks to build the Great Wall of China. However, this court has made its credibility choices, as required by law, and upon those choices has based this opinion.

*Smith v. Dooley,* 591 F.Supp. 1157, 1172 (W.D.La.1984).

Perhaps unlike *Dooley,* the credibility choices in this case were not difficult to make, although they were distressing. Law enforcement officers are generally underpaid and work in circumstances which are difficult and thankless at best. Supervisors therefore have a most demanding task to hire and maintain well-trained, motivated and disciplined officers. It is not the desire or intent of this court to impose impossible standards upon law enforcement officials, but only those standards clearly required by law.

As discussed in detail above, Sheriff Fuselier has countenanced behavior on the part of his deputies which shocks the conscience and demonstrates a deplorable disregard for the constitutional rights of ordinary citizens. The most basic freedoms of our constitutional system are violated when a subordinate law enforcement officer such as Frederick feels free to use his position for the manipulation of political ends, and can brutalize ordinary citizens with impunity.

For the reasons set forth above, judgment shall be entered in favor of the survivors of Mary Thomas, and in favor of Ada Thomas Washington as follows:

(1) Recovery of Mary Thomas' survivors against Russell Frederick and John Pourciaux in their individual capacities, and against Sheriff Charles Fuselier in both his official and his individual capacities:

$20,558.91—Past medical expenses.

$150,000.00—Past pain and suffering, mental anguish, emotional distress, embarrassment and humiliation.

(2) Recovery of Mary Thomas' survivors against Russell Frederick individually: $15,000.00—Punitive Damages

(3) Recovery of Mary Thomas' survivors against Sheriff Fuselier individually: $15,000.00—Punitive Damages

(4) Recovery of Ada Thomas Washington against Russell Frederick individually and Sheriff Charles Fuselier in his official capacity: $5,000.00—Past and future mental anguish and emotional distress.

Plaintiffs are also entitled to recover post-judgment interest, attorneys' fees and all costs of this proceeding.