457 So.2d 79 (1984)
Kenneth JOHNSON
v.
Gregory DIXON and Louisiana Industrial Coatings.
Kenneth JOHNSON
v.
AMAX NICKEL REFINING COMPANY, INC. and Underwriters Adjusting Company.
Nos. CA-2022, CA-2023.
Court of Appeal of Louisiana, Fourth Circuit.
August 31, 1984.
Rehearing Denied October 29, 1984.
Writ Denied December 14, 1984.
*81 Evangeline M. Vavrick, New Orleans, for appellee.
Allain F. Hardin, William N. Hazlaris, Wiedemann & Fransen, New Orleans, for appellant, Gregory Dixon.
Wilton E. Bland, III, Roch P. Poelman, Andrew C. Wilson, Hebert & Abbott, New Orleans, for appellant, Indus. Coatings.
Before GULOTTA, LOBRANO and ARMSTRONG, JJ.
GULOTTA, Judge.
In these consolidated suits resulting from a physical confrontation between two workers at a chemical plant, defendants appeal from a judgment in favor of plaintiff for personal injuries. In answer to the appeals, plaintiff seeks an increase. We affirm.
On November 2, 1978, Kenneth Johnson, an employee of Amax Nickle Refining Company, Inc. (Amax), became involved in an argument with Gregory Dixon, an employee of Louisiana Industrial Coatings (LIC), an independent sandblasting and painting contractor at the Amax plant, after Dixon sprayed him with coal tar in the course of his work. During their heated verbal exchange, Dixon pushed Johnson.
Johnson's personal injury suit against Dixon and LIC was consolidated with his worker's compensation claim against Amax. Continental Insurance Company, Amax's insurer, sought reimbursement for medical and compensation payments made to plaintiff.
Following a trial on the merits, a $273,593.78 judgment was rendered in favor of Johnson and against Dixon and LIC, in solido. Further judgment in the sum of $150,132.75 was rendered in favor of Continental and against Johnson, on Continental's claim in intervention.
Appealing, LIC contends that it is not liable under a theory of respondeat superior because its employee Dixon acted outside the course and scope of his employment. Alternatively, LIC argues that Johnson's recovery should be barred, or at least mitigated, because of his own aggressive conduct justifying Dixon's push. LIC further contends that Johnson failed to prove medical causation between the incident and his subsequent neck and lower back complaints. Finally, LIC claims the award is excessive.
In his separate appeal, Dixon likewise argues that Johnson's provocation justified the push, thereby barring or mitigating Johnson's damages. Alternatively, he argues that Johnson's "mutual combat" constitutes contributory negligence. If found at fault for the incident, however, Dixon contends that the altercation arose out of a work-related conflict, making his employer LIC vicariously liable. Further in the alternative, he asks that his limited financial means be considered in rendering any judgment against him.
In answer to the appeals, Johnson seeks an increase of the $273,593.78 judgment to $703,017.48, for future medical expenses, past and future loss of earnings, pain and suffering, and permanent physical impairment.

PROVOCATION
The argument ensued after Johnson, an Amax chemical operator working on the floor of the plant, was hit by some coal tar sprayed by Dixon, an LIC painter working overhead.
According to Dixon's version of the incident, someone working on the floor below "yelled up" at him and his partner to stop painting. Although Dixon testified that he had been instructed by his supervisor that he had "top priority" and was not to shut down his operation unless ordered by his foreman, he decided to stop, to "give the guy a break". Shortly thereafter he resumed spraying, whereupon Johnson called him a "white bitch" and a "mother f____r" and said, "Come down here and I am going to kick your ass." According to Dixon, after he descended to tell Johnson what the procedures were and to see if he would kick him, Johnson "made a flinching motion" and Dixon reflexively pushed him *82 away. Dixon testified that Johnson did not fall.
On the other hand, Johnson testified that after yelling to Dixon to stop spraying the second time, Dixon hollered, "You can't tell me what to do. My supervisor is the only one that can tell me." Johnson further stated that Dixon called him a "nigger" and threatened to come down and spray him "black". According to Johnson, after further argument he turned to get his supervisor, whereupon Dixon pushed him against a steel beam. Johnson denied cursing or striking Dixon.
Johnson's version of the incident was corroborated by Larry Jones, Dixon's co-worker. According to this witness, Johnson "didn't want to fight", and he did not see him make a move before Dixon pushed him into a beam. Although Jones thought there was going to be a fight, he testified that Johnson "didn't fight back." Although he did not witness the push, another worker in the area, Edward Frazier, Jr., also saw Johnson fall and strike a beam.
After a plaintiff in a battery case proves a prima facie case, the defendant must prove justification or provocation for the battery under the particular circumstances. Dean v. Nunez, 423 So.2d 1299 (La.App. 4th Cir.1982), writ denied 430 So.2d 76 (La.1983); Freeman v. Lee & Leon Oil Co., Inc. 409 So.2d 408 (La.App. 4th Cir.1982). To establish provocation, the defendant must show some conduct or action by the plaintiff sufficient to provoke and arouse the defendant to the point of physical retaliation. Knuckles v. Beaugh, 392 So.2d 710 (La.App. 3rd Cir.1980). Mere words, however, even if designed to excite or irritate, cannot excuse a battery. Morneau v. American Oil Company, 272 So.2d 313 (La.1973); Dean v. Nunez, supra.
The evidence considered, we find no error in the trial judge's implicit conclusion that Johnson did not provoke this incident. Before Dixon's push, the two men had exchanged some profanity. Indeed, Dixon himself acknowledged that the words involved were commonly used by construction workers and that nobody gets too excited by them. Johnson's movement in turning away, which Dixon interpreted as an attempted punch, did not justify a physical retaliation. Significantly, Dixon demonstrated Johnson's "flinching motion" at trial for the court's benefit. As a matter of credibility, we cannot say the trial judge erred in failing to interpret Dixon's push as a justifiable act of self-defense.
We therefore conclude that Johnson's behavior during the incident did not constitute aggression or mutual combat sufficient to bar or limit his recovery.

RESPONDEAT SUPERIOR
We likewise reject LIC's argument that its employee Dixon was not acting within the course and scope of his employment during the incident. According to LIC, Dixon's personal motives to punish Johnson for racial taunts and to "appease his own machismo" were not in furtherance of LIC's interests as an independent contractor at the Amax plant. We disagree.
An employer's liability under the doctrine of respondeat superior for the tortious act of its employee depends on the facts and circumstances of each case, including whether the employee's conduct is closely related in time, place and causation to his employment. LSA-C.C. Art. 2320; Schaeffer v. Duvall, 421 So.2d 262 (La. App. 4th Cir.1982), writ denied 427 So.2d 1209 (La.1983); Puccio v. Finch, 454 So.2d 272 (La.App. 4th Cir.1984). When a dispute involving an employee erupts into violence, the question is whether it was "primarily employment-rooted" and regarded as "a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's business interests." LeBrane v. Lewis, 292 So.2d 216 (La.1974); Weysham v. New Orleans Public Service, Inc., 385 So.2d 19 (La.App. 4th Cir.1980), writ denied 392 So.2d 690 (La.1980); Gautreau v. Davis, 350 So.2d 268 (La.App. 4th Cir.1977), writ refused 352 So.2d 236 and 237 (La. 1977).
*83 In the instant case, the dispute between Johnson and Dixon concerned which worker had priority to perform his job in the area. Dixon understood that LIC painters were not to stop spraying unless so instructed by an LIC supervisor, whereas Johnson believed that Amax employees had priority and could stop LIC painters if they interfered with Amax work.
Dixon testified that he had approached Johnson to explain that he could not stop spraying at his request and to inform him of the proper procedure, as well as to see if Johnson would carry out his threat to kick him. According to Johnson, the dispute began when Dixon sprayed him and said he would not stop for him or anyone but his supervisor. In an accident investigation report of the incident, Ronald Burmaster, an Amax supervisor, indicated that Dixon and Johnson's working in the same area and the painters' instructions "not to shut down their operation, unless notified by their foreman" were the conditions contributing most directly to the accident.
Although racial slurs and some personal bravado were undoubtedly involved, it is clear that this argument between these workers was primarily employment-rooted and reasonably incidental to the performance of each worker's duties in furtherance of his employer's business. Accordingly, we find no error in the trial judge's conclusion that Dixon acted in the course and scope of his employment, thereby making LIC solidarily liable under the doctrine of respondeat superior for his tortious conduct.

CAUSATION
We likewise find no merit to LIC's contention that Johnson failed to prove causation between the November 2, 1978 incident and his back and neck injuries. According to LIC, Johnson's trauma from Dixon's "slight defensive push" was "minimal". We disagree.
Johnson testified that Dixon's push caused him to fall backward against a steel beam and land in a sitting position on the floor after hitting a concrete foot high embankment at the bottom of the beam. After receiving first aid from the company nurse on the day of the accident, he worked in increasing pain until November 13, 1978, when he physically left work at Amax and never returned.
On November 16, 1978, plaintiff saw Dr. William H. Hill, who diagnosed his condition as cervical, thoracic and lumbar sprain, with the main problem in the lumbar area. Dr. Hill prescribed conservative treatment in follow-up visits but the pain continued. On January 10, 1979, Dr. Hill indicated plaintiff might possibly have some disc problem.
While seeing Dr. Hill, Johnson was also treated by Dr. Robert Segura, a specialist in industrial medicine with emphasis in orthopedics. In a January 3, 1979 examination, Dr. Segura found mainly subjective complaints of low back pain with no positive findings. He diagnosed plaintiff's condition as "lower back contusion" and prescribed conservative treatment. In follow-up visits of January 10 and February 2, 1979, Dr. Segura found no change in plaintiff's condition and no evidence of nerve root problems or disc problems in the lumbar area. He felt Johnson was free to return to work, but acknowledged that tests sometimes show disc irregularities in patients who have no objective findings.
On January 18, 1979, on Dr. Hill's referral, plaintiff was examined by Dr. James Williams, an orthopedic surgeon. His examination of plaintiff's lower back revealed no nerve root compression or spasms. Although his x-rays were normal, Johnson experienced decreased sensation to pin pricks in his lower left leg from the groin to the toes. Dr. Williams testified it was not unusual for a herniated disc to remain latent for six months and then appear.
On March 7, 1979, plaintiff saw Dr. Richard W. Levy, a neurosurgeon, on continued complaints of low back pain, and numbness and tingling in his leg and left forearm and hand. Although Dr. Levy found no evidence of nerve root injury or lumbar disease, it is significant that he did detect an *84 objective symptom of spasm in the lumbar region. He suggested an orthopedic evaluation.
On May 16, 1979, as a referral from Dr. Hill, plaintiff underwent a neurological evaluation by Dr. Richard D. Palmer, on complaints of lumbar pain, leg numbness and shaking of the left arm. Although Dr. Palmer found no spasm, he thought plaintiff should have an electromyelogram and undergo never conduction studies.
On July 16, 1979, Dr. Naum Klainer, an orthopedic surgeon, examined Johnson to determine his disability status for the Louisiana Department of Health and Human Resources. Although this physician detected no spasm, he found diminished leg reflexes and other findings that were compatible with possible nerve root irritation caused by a disc. Dr. Klainer considered Johnson disabled until further examination to rule out nerve damage.
On July 24, 1979, Johnson began treatment under Dr. Amilcar J.E. Correa, a neurosurgeon. This physician's initial impression was that plaintiff had lumbar sprain, but x-rays and an electromyelogram showed evidence of neurogenic atrophy and nerve root involvement at the L-5S-1 level. When plaintiff was hospitalized on August 13, 1979, a myelogram showed a defect at the L-4-5 disc space consistent with a ruptured disc. Following prolonged conservative treatment without improvement, plaintiff was hospitalized again from April 30 through May 17, 1980, when he underwent a discectomy and a laminectomy at the L-4-5 level.
In addition to his low back problem, Johnson had also complained to Dr. Correa of neck pain in late April, 1980. An electromyelogram on May 6, 1980 showed nerve root degeneration and defects in the cervical veterbrae.
Following a back operation, plaintiff continued with conservative treatment including traction during a ten-day hospitalization in September, 1980. During his re-hospitalization from July 27 through August 3, 1981, a myelogram showed defects in the L-4-5 surgery area, as well as cervical defects. After further conservative treatment and confirmation in a CAT scan and another myelogram, plaintiff underwent an anterior cervical discectomy and fusion at the C4-5, C5-6 levels during hospitalization from March 19 through April 13, 1982. Meanwhile, he underwent psychological treatment for severe depression.
Plaintiff was followed by Dr. Correa in several other visits through October 22, 1982. His neck had improved, but he continued to experience low back pain with numbness in his legs. A CAT scan on December 30, 1982, showed scarring around the nerve roots in the lower back from myelograms. At the time of trial, on April 19, 1983, Johnson was still undergoing outpatient physical therapy and counseling for persistent depression.
Dr. Correa testified that plaintiff had good results from the cervical operation, but continued to have persistent complaints about his lower back. Although he stated that Johnson was 100% disabled for manual labor, this physician felt he could be trained for "sedentary" work. Dr. Correa was of the opinion that plaintiff's lower back and cervical disc problems were caused by the November 2, 1978 injury. He did not find the delay in complaints about the neck problems until April, 1980, to be medically significant, since plaintiff's back pain from the accident could have masked the neck symptomatalogy.
The medical evidence considered, we conclude, as did the trial judge, that Johnson established causation between the work-related incident and his disabling neck and lower back disc injuries requiring surgery. Accordingly, we find no error.

QUANTUM
In his written "Reasons for Judgment", the trial judge stated:
"The Court has no difficulty in assessing liability, however, the evidence presented at trial was not as specific or clear as it should have been with respect to damages and injury suffered and received by plaintiff. Damages cannot be *85 awarded on a speculation of the parties. In this case the evidence offered by plaintiff leaves much to be desired in precisely and accurately computing and awarding damages and accordingly the Court has computed damages in the light most favorable to plaintiff...."
The $273,593.78 award includes $43,593.78 in stipulated past medical damages, with the remainder for unspecified future medical expenses, wage loss and general damages.
In answer to defendants' appeals, plaintiff seeks an increase to the sum of $703,017.48 to include: $43,593.78 for past medical expenses; $32,180.00 for future medical expense, $87,243.70 in past loss of earnings, $140,000.00 for future loss of earnings; $200,000.00 for mental anguish, pain and suffering; and $200,000.00 for physical impairment of bodily functions. On the other hand, LIC contends the trial court's award is excessive. Dixon, who presented evidence of his poverty at trial, seeks mitigation of damages in light of his limited means.
We reject plaintiff's claim for an increase. Although Johnson presents detailed and skillful arguments for a higher award based on specific dollar amounts for each aspect of his loss, the evidence adduced at trial simply does not support those figures.
Plaintiff's claim for $32,180.00 in future medical expenses is composed of $20,000.00 for surgery and hospitalization, and $12,180.00 for out-patient treatment at the rate of $420.00 per year during his 29 year life expectancy. Significantly, however, Dr. Correa merely alluded to the possibility of future surgery, and did not indicate that plaintiff would be required to have regular out-patient care for the balance of his life. Under these circumstances, plaintiff's argument is unfounded.
Similarly, we are not persuaded by plaintiff's claim for $140,000.00 for future loss of earnings. Johnson's argument for this specific amount is based on a 28.5 year work life expectancy and an annual income loss of $12,642.84, discounted at 8%. This figure assumes, however, that Johnson would have continued to earn his 1977 career high earnings of $20,234.84 per year, had his injuries not relegated him to "some form of minimum wage employment" in the future. We reject this approach.
Although a stipulated letter from Amax indicates plaintiff's earnings and work history prior to the injury, proof is lacking that Johnson would have continued to earn an annual income comparable to or greater than his 1977 salary. Moreover, Dr. Correa only testified that plaintiff could no longer do manual labor, although he may be capable of performing sedentary work. He did not state that such non-physical work will be at a minimum wage or of a menial nature. Plaintiff's claim for a specific future wage loss of $140,000.00 is simply not supported by the record.
We recognize that Johnson has proven a permanent medical disability as a result of this accident, and has presented evidence of pain and suffering from serious injuries that have required extensive treatment and surgical intervention. We recognize also that future loss of earnings, while somewhat speculative in character, cannot be calculated with absolute, mathematical certainty. See Robinson v. Graves, 343 So.2d 147 (La.1977); Roundtree v. Technical Welding & Fabrication Co., 364 So.2d 1325 (La.App. 4th Cir.1978). Nonetheless, as noted by the trial judge, we are confronted with a record that simply does not support the specific dollar amounts sought by plaintiff. Considering the evidence, or the lack thereof, we conclude the trial court's award is neither inadequate nor excessive.
We likewise reject Dixon's argument for a reduction based on evidence of his poverty. We cannot say the trial judge failed to consider Dixon's means in setting the award. Moreover, this argument might be more persuasive had Dixon been cast solely liable, rather than liable in solido. We find no basis for reducing the award.
*86 Accordingly, for the foregoing reasons, the judgment is affirmed.
AFFIRMED.