802 So.2d 824 (2001)
Robbie L. CLARK
v.
Robert Brent BURCHARD, d/b/a Chalmette Restaurants Ltd. and Alexander Filmore.
No. 2000-CA-2750.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 2001.
*826 Terry A. Bell, Carimi Law Firm, Metairie, LA, Counsel for Plaintiff/Appellant.
Arthur W. Landry, Plauche, Maselli, Landry & Parkerson, L.L.P., New Orleans, LA, Counsel for Defendant/Appellee.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JOAN BERNARD ARMSTRONG, and Judge TERRI F. LOVE.
WILLIAM H. BYRNES III, Chief Judge.
On January 18, 2000, the trial court rendered a judgment in favor of the plaintiff, Robbie Clark, and against the defendant, Alexander Filmore[1], for $3,000.00 with legal interest for damages arising out of a physical altercation. The judgment also dismissed all of plaintiff's claims against Wendy's International, Inc. Plaintiff appeals. We affirm.
*827 This is a case that turns largely on credibility calls made by the jury which will only be overturned by this Court if found to be manifestly erroneous or clearly wrong.
Plaintiff's brief describes the incident resulting in his alleged injuries that occurred when he and his companion, Arthur Muncy, went to a Wendy's Restaurant as follows:
While waiting at the counter for their food to be prepared and given to them, Clark and Muncy observed several customers who had already been served return their orders to the counter with complaints about the food. After waiting for their food for what seemed to be a long period of time, Clark asked for his money to be returned. [cite to trans. omitted] Muncy then went outside to the car. [cite to trans. omitted]
When Clark demanded the return of his money, an argument ensued about the service and the return of his money. As the argument with the counter person continued, Alexander Filmore came to the counter, and, in a derogatory way, told Clark to "keep your white ass out of here." Exasperated with the service and Filmore's comment Clark backhanded a soft drink that was on the counter and then proceeded to walk out of the building. [cite to trans. omitted.]
Clark left the building on his own without any physical confrontation with Filmore [cite to trans omitted], but after Clark had exited the building, Filmore left from behind the service counter and pursued him into the parking lot [cite to trans. omitted] where he violently attacked Clark without any warning. The force of the attack drove Clark's head into the driver's side door handle of the automobile driven by Clark and Muncy [cite to trans. omitted] causing two fractured ribs, head trauma and severe cervical strain. [Cite to trans. omitted.]
The testimony of Lisa Satterlee and Lashawn Traylor, former Wendy's employees who were on duty at the time of the incident, paints such a different picture of what occurred from that testified to by the plaintiff that the apparent decision of the jury to believe them would necessarily involve a decision that the testimony of the plaintiff was not credible. Both ladies described Mr. Clark's request for the return of his money as loud, aggressive and profane. Both testified that while Ms. Satterlee was trying to process the requested refund, Mr. Clark threatened to come over the counter and choke her. Ms. Satterlee quoted him as saying: "[I]f you don't give me my f______g money now, I am going to come over the counter and I am going to choke you and hurt you!"
The jury in answers to interrogatories found that the plaintiff was injured by Alexander Filmore, a defendant who was the Wendy's employee but that the plaintiff was the aggressor. They also found that Alexander Filmore did not act reasonably in repelling the aggression, but that his acts were not done in the course and scope of his employment with Wendy's. The jury found that the plaintiff sustained $10,000.00 in general damages and $2,000.00 for past medical expenses, for a total of $12,000.00 in damages. This figure was reduced in the judgment to $3,000.00 as a result of the jury finding that the plaintiff was 75% at fault for the damages he sustained and that the Alexander Filmore was 25% at fault. No fault was ascribed to Wendy's.

I. ASSIGNMENT OF ERROR NO. 1
Plaintiff complains of the following language in the fourteenth jury charge:
To recover for a battery, the plaintiff must prove by a preponderance of the evidence that his damages resulted *828 from an unprovoked attack by another. After a plaintiff in a battery case proves a prima facie case, the burden shifts to defendant to prove justification or provocation for the battery under the particular circumstances. There may be conduct which, while not justifying the battery complained of, may be of such nature under the circumstances to have provoked or contributed to the incident ... [Emphasis added.]
Plaintiff contends that this language incorrectly places the burden of proof upon the plaintiff to first prove that he did not provoke the defendant. Plaintiff argues that this charge has the improper effect of shifting the burden to the defendant to show justification only after the plaintiff has first shown lack of provocation. Plaintiff takes the position that his initial burden is to show only that he has been battered which effectively shifts the burden to the defendant to prove justification or provocation. Plaintiff cites Johnson v. Dixon, 457 So.2d 79, 82 (La.App. 4 Cir. 1984), where this court said:
After a plaintiff in a battery case proves a prima facie case, the defendant must prove justification or provocation for the battery under the particular circumstances.
The plaintiff's contention makes sense where the facts show that the plaintiff was subjected unilaterally to a battery. But in the instant case the facts show that the plaintiff and defendant were engaged in mutual combat. If we were to apply plaintiff's reasoning to mutual combat situations, it would mean that whichever party filed suit first could shift the burden of proof to the defendant (because either party could make an initial showing that he was battered) with the perverse result of relieving the plaintiff of the normal burden of proof where there is no public or evidentiary policy served in doing so. In mutual combat situations, reason and logic dictate that the plaintiff must show that the defendant was the aggressor or in the words used by the trial court, "the plaintiff must prove by a preponderance of the evidence that his damages resulted from an unprovoked attack by another." This view of the law is reflected almost verbatim in the jury charge of which the plaintiff complains. Wendy's cites Sills v. Mid-South Sports, Inc., 550 So.2d 909, 912 (La.App. 2 Cir.1989), in support of the propriety of the jury charge:
To recover for a battery, a plaintiff must prove by a preponderance of the evidence that his damages resulted from an unprovoked attack by another. Tripoli v. Gurry, 253 La. 473, 218 So.2d 563 (1969). A plaintiff whose conduct provokes another to use physical force in fear or anticipation of future injury at the hand of the aggressor may not recover damages for the battery. Robinson v. Hardy, 505 So.2d 767 (La.App. 2 Cir.1987).
In that portion of plaintiff's appellate brief devoted to this assignment of error, the case most frequently cited by the plaintiff is Girvan v. NOPSI, 94-0681 (La. App. 4 Cir. 11/30/94), 646 So.2d 481. The language used by this Court in that case which continues to guide us in the instant case is as follows:
"In making his charges to a jury, a trial judge is not required to give the precise instructions submitted by either party, but rather, has a duty to charge the jury as to the law applicable to a case and, to accomplish this, has the responsibility to reduce the possibility of confusing the jury. [Citation omitted.] Further, as was stated by the Fourth Circuit in Brown v. White, 405 So.2d 555 (La.App. 4th Cir.1981), appellate courts must exercise great restraint before overturning a jury verdict on the suggestion the *829 instructions were so erroneous as to be prejudicial. The pertinent question involved in making the decision as to error is whether the jury was misled to such an extent as to prevent it from doing justice." Cuccia v. Cabrejo, 429 So.2d 232, 235 (La.App. 5 Cir.1983), writ denied, 434 So.2d 1097 (La.1983).
Id., at 483-484.
In Girvan this Court added emphasis to the restraint described above that should be practiced by appellate courts in reviewing jury instructions with the following language:
"The mere discovery of an error in the trial judge's instructions does not, of itself, justify an appellate court conducting the equivalent of a trial de novo, without first measuring the gravity and degree of the error, and considering the instructions as a whole and the circumstances of the case ... In reviewing the record, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and facts." Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 455 (La.App. 4th Cir.1986).
Id., at 484.
The jury instruction complained of by the plaintiff was not erroneous and/or to the limited extent that it may be considered to be so, it was not so incorrect as to preclude the jury from reaching a verdict based on the law and the facts.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error the plaintiff complains that the trial court submitted a verdict form to the jury that did not comply with the applicable law and evidence presented at trial. The jury was asked in one interrogatory to determine whether the plaintiff was the aggressor. In response to this interrogatory the jury found the plaintiff to be the aggressor. In another interrogatory the jury was asked whether Filmore acted reasonably in repelling the plaintiff's aggression. In response to this interrogatory the jury found that Filmore had not acted reasonably.
In this second assignment of error the plaintiff complains that the interrogatories should have provided the jury with the additional option of finding that the plaintiff withdrew from the original confrontation, and that the attack in the parking lot was a battery in which Filmore was the aggressor. The plaintiff contends that plaintiffs original aggression had ended when he walked out of the restaurant into the parking lot and that when Filmore followed him into the parking lot he became the aggressor. While it may be true that the plaintiff must be said to have withdrawn from any aggression he may have shown within the restaurant, it does not prevent a finding that he resumed his aggressive posture when Filmore confronted him in the parking lot. The version of events that plaintiff presents in his brief was not only not believed by the jury, it would not be believed by this Court even under a de novo standard of review. The version of the story presented by the defendants' disinterested witnesses was not only believed by the jury, it would be believed by this Court even on de novo review. The defendants' witnesses told a story that is not only more believable, the witnesses themselves have no interest in the outcome and no relationship to the defendants, whereas the jury could legitimately have taken into account the plaintiff's interest in the outcome of the case and the fact that his sole witness to the events, Mr. Muncy, was his first cousin by marriage.
The aggressive, abusive and threatening behavior plaintiff demonstrated while inside *830 the premises when contrasted with that of Mr. Filmore, is consistent with the conclusion that Mr. Filmore was not the aggressor on the outside. Moreover, it is much more reasonable to believe that Mr. Filmore was not the aggressor when he was acting alone and the plaintiff had his companion and cousin by marriage, Mr. Muncy, as an ally. The defense version of events that Mr. Filmore followed the plaintiff into the parking lot merely to ensure that he left the premises is consistent with his actions up to that point, whereas the peaceful manner in which the plaintiff describes his own actions belie his behavior up to that point: "Well, I left the building and the next thing I knew, somebody was on top of me." Plaintiff testified that he did not believe that in the ensuing altercation that he ever struck Mr. Filmore and that at all times Mr. Filmore had the advantage over him until Mr. Muncy pulled Mr. Filmore off of him.
Mr. Muncy described the initial encounter differently:
Q. What happened when [Mr. Filmore] walked out the door behind [the plaintiff]?
A. [The plaintiff] turned around and looked at him, and he had his hands in his pockets.
Q. [The plaintiff] did?
Q. Yes.
Q. And [Mr. Filmore] said, he asked [the plaintiff], "What you need, a knife to whip my ass or something?" And [the plaintiff] said no, and he had his hands in his pockets, and as he started to come out with his hands out of his pockets, [Mr. Filmore] pushed him like that (indicating), about 10 or 12 foot, and he went back and hit the wall pretty hard and kind of slid down the wall.
Moreover, Mr. Muncy testified that he did not see what transpired at the counter as he had already gone out to the car at the time.
As in the case of the jury instruction discussed in the previous assignment of error, we do not find that the jury interrogatory complained of by the plaintiff was so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts in this case.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, plaintiff complains that the jury finding that plaintiff was the aggressor was contrary to the overwhelming uncontradicted evidence that Filmore was the aggressor. The plaintiff does not dispute the principles of the manifestly erroneous/clearly wrong standard of appellate review of factual findings of the jury.
Lashawn Traylor described the incident as follows:
Q. Okay, what, if anything, called your attention to the Wendy's customer involved in the incident with Alexander Filmore?
A. His yelling. The language he used.
Q. What do you first recall him saying that called your attention to him?
A. He said, "Give me my money back. You are taking too long." And Lisa said she was going to give him his money back. So after that he said, "You give me my F-ing money back right now."
Q. He said, "You give me my F-ing money back" using the "F" word, right?
A. Yes
Q. Was he speaking loudly?
A. Yes, very loudly.
Q. And you heard Lisa say what?
A. "I am going to give you your money back."
Q. What did he say next?
A. He said, "If you don't give me my money back I am going to come over the *831 counter and choke you." And Alex said, "You don't have to talk to her like that."
* * * *
Q. What did the [plaintiff], if anything say back to Alexander Filmore?
A. "Shut up, you [n ...] And that is when [the plaintiff] threw the cold drink."
* * * *
Q. Did it hit Mr. Filmore?
A. Yes.
* * * *
Q. Did the [plaintiff] walk straight out the door?
A. No. He was yelling and she asked him to leave.
Q. What were the things you remember he was yelling?
A. "I am going to F-ing choke you, you [n ...] And his friend was telling him to come on."
Ms. Traylor then testified that Mr. Filmore walked from behind the counter and followed the plaintiff and his friend out to make sure that they left. When she went to the window she saw the plaintiff, his friend and Mr. Filmore outside:
Alex [Filmore] was on the ground and the [plaintiff] was punching him. And Alex got up and hit him back. And Lisa told me to return to my station and told the other manager to call the police. And she called the police and the guys got in the car.
Ms. Traylor went on to testify that Ms. Satterlee, who was in charge of the restaurant at the time did not ask Mr. Filmore to become involved or to protect her. However, Ms. Traylor described the plaintiff as being, "very aggressive, like he was going to grab the cashier."
Ms. Traylor did not see who started the fight in the parking lot, but she did say that Mr. Filmore was not acting in an aggressive manner when he came out from behind the counter and followed the plaintiff and his friend out into the parking lot. On cross-examination by the plaintiff's attorney, Ms. Traylor testified that plaintiff was in a fighting mood when he was in the restaurant.
Ms. Satterlee, a former Wendy's employee, was the assistant manager in charge of the store at the time of the incident. She testified that when she tried to comply with the plaintiff's request for a refund he became impatient:
[W]hen I was doing that, [plaintiff] said, "Just give me my [f ....ing] money." And I said, "Sir, as soon as the register changes over to the refund mode I can do that for you. It will still be a second." And he said, "If you don't give me my [f ... ing] money now, I am going to come over the counter and I am going to choke you and hurt you."
Consistent with the earlier testimony of Ms. Traylor, her fellow former worker, Ms. Satterlee testified that Mr. Filmore told the plaintiff that there was no need to address her in such a manner. Plaintiff then told Mr. Filmore to be quiet or he would "be next." She testified that plaintiff then picked up a cold drink cup and threw it at Mr. Filmore, hitting him and another employee. At that point she told another employee to call the police, gave the plaintiff his money and told him to leave.
She testified that the plaintiff continued to yell at Mr. Filmore who she instructed not to leave from behind the counter. She also instructed Mr. Filmore not to go outside. The last she saw Mr. Filmore he had stopped at the door. When she heard someone say, "a fight," she went out to the parking lot where she saw Mr. Filmore *832 being held in a choke hold by the plaintiff who was also striking him. At the same time she said that plaintiff's friend, "had Alex kind of like around the other side, but not choking him, you know." She also saw Mr. Filmore strike the plaintiff while trying to get out of the choke hold.
In weighing the conflicting testimony, the jury was entitled to make its credibility calls in favor of the disinterested defense witnesses and against the testimony of the plaintiff and the man married to his wife's first cousin. In doing so, the jury could reasonably infer that the plaintiff was the aggressor. Based on this analysis of the record as a whole, we cannot say that the finding of the jury that the plaintiff was the aggressor was either manifestly erroneous or clearly wrong.

ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error the plaintiff complains that the jury's apportionment of fault was clearly wrong and against the overwhelming weight of the evidence. The jury assigned 75% of the fault to the plaintiff and 25% of the fault to Mr. Filmore.
The determination of whether comparative fault applies in a particular case is essentially a factual one and subject to the manifest error standard of review. Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610-11. Only if the apportionment of fault is found to be clearly wrong can an appeal court adjust percentages, and then only to the lowest/highest point within the factfinder's reasonable discretion. Id. at p. 7-8, 666 So.2d at 611.
The apportionment of fault is not subject to mathematical exactitude. The "great, even vast" discretion of the jury in matters of general damages first described as such in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), has been noted so often as to become a cliche. In Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), p. 7-8, 666 So.2d 607, 610-611, the Louisiana Supreme Court noted that quantum determinations are analogous to allocation of fault determinations. As this Court explained in Riley v. Reliance Insurance Company, et al., 97-CA-0445 p. 6-7 (La.App. 4 Cir. 11/19/97); 703 So.2d 158, 163:
Thus, Clement tells us that the allocation of fault is not an exact science, or the search for one precise ratio. Rather, it is an acceptable range and any allocation by the jury within that range cannot be "clearly wrong." In Clement, the Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable. This very broad range is illustrative of the analogy referred to in the passage quoted above from Clement, comparing fault and quantum determinations. Mindful that in quantum determinations Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder "great, even vast" discretion, the Clement analogy mandates this Court to afford considerable latitude to the trial court in matters of fault allocation.
The great breath of what was deemed acceptable in allocating fault in Clement went all the way from a 50/50 allocation of fault where the allocation between the two parties is equal, to a 75/25 allocation of fault, where there is a fifty percentage point difference in the amount of fault allocated between the two parties. It is no wonder that the Clement court saw an analogy between the discretion permitted the fact-finder in the allocation of fault and the "great, even vast" discretion given the fact-finder in the fixing of general damages.
*833 Our review of the incident taken from the record as a whole, as set forth previously in this opinion, provides more than a sufficient rational basis to support a finding that jury acted well within the broad parameters of its discretion in apportioning fault. Under a de novo standard of review, this Court might assign an even greater percentage of fault to the plaintiff. We find no merit in plaintiffs fourth assignment of error.

ASSIGNMENT OF ERROR NO. 5
In his fifth assignment of error the plaintiff complains that the jury's factual finding that Alexander Filmore was not acting within the course and scope of his employment with Wendy's is manifestly erroneous and clearly wrong.
Plaintiff does not contest the fact that Ms. Satterlee, who was in charge of the restaurant at the time of the incident, ordered Mr. Filmore to remain behind the counter. She also ordered him no to go outside.
The plaintiff also does not contest the fact that the finding by the jury below that Mr. Filmore was not acting within the course and scope of his employment is governed by the manifest error rule. Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990); Patterson v. Al Copeland Enterprises, Inc., 95-2288 (La.App. 4 Cir. 1/19/96), 667 So.2d 1188.
We take note of the primary factors enumerated by the Supreme Court to be used when deciding whether vicarious liability should attach to an employer for the acts of an employee:
(1) whether the tortious act was primarily employment rooted;
(2) whether the violence was reasonably incidental to the performance of the employee's duties;
(3) whether the act occurred on the employer's premises; and
(4) whether it occurred during the hours of employment.
Baumeister v. Plunkett, 95-2270, p. 4 (La.5/21/96), 673 So.2d 994, 996-997.
But Baumeister also explains that:
Vicariously liability will attach [when an employee commits an intentional tort on the business premises during working hours] only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective.
Id., p. 3-4, 673 So.2d at 996.
In the instant case where Mr. Filmore acted in contravention of two direct and immediate orders, the jury could reasonably conclude that he was not acting within the ambit of his assigned duties. Moreover, we cannot say that a juror was either manifestly erroneous or clearly wrong who concluded that actions undertaken by an employee in contravention of two direct and immediate orders were not undertaken in furtherance of the employer's objective.
Ermert, supra, explains that the basis for vicarious liability on the part of the employer in situations such as the one before this Court is that:
A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
Ermert, 559 So.2d at 476.
In the instant case we can assume that Mr. Filmore did more than violate some passive general company policy. We know of no instances where it can be said to be company policy to engage in unprovoked assaults upon company customers. What distinguishes this case from those is that in the instant case Mr. Filmore violated two *834 immediate and direct orders form his superior the orders to remain behind the counter and the order not to go outside. Here the employer through its agent Ms. Satterlee, Mr. Filmore's superior, did all that it could from a control perspective to prevent the incident. We see no policy reason why an employee acting in direct contravention of two direct and immediate orders should be considered as acting within the course and scope of his employment. As the Supreme Court stated in Baumeister, supra:
In sum, there is no magical formula to establish vicarious liability for intentional torts committed by employees. We do hold, however, that as a matter of law an employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours.
Under the facts of this case, we find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. 6
In his sixth assignment of error the plaintiff complains that the trial court erred as a matter of law in failing to properly apply the provisions of LSA-C.C. art. 2323C regarding the reduction of a plaintiff's damages due to the actions of an intentional tortfeasor. LSA-C.C. art. 2323C provides that:
Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced. [Emphasis added.]
LSA-C.C. art. 2323C applies only where the plaintiff's contributory fault consists of negligence. It does not apply where the plaintiff's fault is intentional in nature. See Babb v. Boney, 30,443 (La.App. 2 Cir. 4/8/98), 710 So.2d 1132. Wijngaarde v. Parents of Guy, (La.App. 4 Cir.), 720 So.2d 6, writ denied (La.), 738 So.2d 574, cited by the plaintiff is distinguishable. In Wijngaarde this Court specifically found that the plaintiff acted negligently.
Plaintiff can cite no authority or any public policy in support of this sixth assignment of error. We find no merit in plaintiff's argument.

ASSIGNMENT OF ERROR NO. 7
In his seventh assignment of error the plaintiff complains about the jury's award of special damages. However, based on a review of the record as a whole the jury could have inferred both that not all of the plaintiff's medical complaints were real and that of those that were, many may not have been causally related to this incident. A reasonable jury could view the plaintiff's complaints of pain and disability as inconsistent with his admission that about six months after the incident he passed a physical for and took a job as a truck driver. At the time he signed a health form stating that he had no head or spinal injuries and that his vision was correctable to 20/20.
Plaintiff's lack of credibility could also be said to undermine the opinions of his medical experts to the extent that those opinions were based on information supplied by him.
Plaintiff was referred to Dr. John Olson who first saw the plaintiff on September 7, 1995, a few days after the incident. Dr. Olson's records noted no laceration to plaintiff's head. Plaintiff said that the incident left him foggy at the time, but Dr. Olson noted no signs of foggyness on September 7. Dr. Olson's neurological findings were within normal limits. He noted no back or leg complaints at the time of the visit. On November 15, Dr. Olson sent plaintiff for an MRI of the brain which came back normal.
*835 Dr. Olson then had an EMG performed which came back positive. Dr. Olson testified that EMG's have a fairly high rate of false positives, so he had a cervical MRI performed by Dr. Lavis who found it to be normal, although Dr. Olson did not agree with Dr. Lavis' findings. Dr. Olson felt that the MRI showed some damage at the C4-5 and C5-6 levels. Thirty-six months after the incident, the plaintiff underwent a myelogram and CT scan indicating some damage at the C7-T1 level, not the C4-5 and C5-6 levels.
Dr. Olson acknowledged that Dr. April's cervical MRI showed no definite spine abnormality. Dr. Olson also acknowledged that Dr. Toussaint Leclercq reported in December of 1997 that the plaintiff had a normal neurological exam. And although Dr. Adrian Blotner, another of plaintiff's physicians, testified that he made findings consistent with some of the plaintiff's reported symptoms, these findings were based on a SPECT scan of the brain which the radiologist performing the scan interpreted as being in the normal range and showing no definite abnormalities.
Dr. Blotner also discussed a discogram performed by Dr. April who interpreted it as failing to establish the source of the dominant symptoms of subjective headache and high cervical pain.
Dr. William Martin, the expert neurologist for the defense, reviewed the reports and diagnostic tests of the other doctors.[2] In reviewing the reports of Dr. LeClerq he found no injury to the cervical spine or any neck injury that could account for lower back or leg complaints. In reviewing Dr. April's reports, Dr. Martin found no indication of any compression of nerve structures such as would produce any neurological symptoms in the plaintiff. He found nothing clinically significant in the MRI performed by Dr. April.
Dr. Martin also found that the SPECT scan performed in order to detect any evidence of brain injury or damage was within the normal range. Dr. Martin testified that:
The study performed at Chalmette Medical Center stated no MRI evidence of any acute intracranial pathology. The one done at Diagnostic Imaging reported a normal study of the brain, without evidence of chronic products hemorrhage, edema or mass lesion. Also performed was an MR Angiogram with no evidence of intracranial aneurysm.
Dr. Martin also found the neuropsychological evaluation of Dr. Susan Andrews to be normal. Dr. Martin concluded his testimony on direct examination by stating that, "I could find no objective evidence that there was any brain injury in this man."
Ultimately, it is the province of the trier of fact to weigh expert testimony and decide which to accept and which to reject. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1111 (La.1990).
Based on the foregoing, we infer that the jury concluded (as would be within their discretion to do) that the plaintiff's symptoms were not what he contended them to be, and that to the extent that they were, they were not causally related to the incident that is the subject of this litigation.

ASSIGNMENT OF ERROR NO. 8
Plaintiff in his eighth assignment of error complains that the jury's award of general damages is inadequate and constitutes an abuse of the fact-finder's discretion. The reasoning above leading to the rejection by this court of the contentions *836 made by the plaintiff in his seventh assignment of error applies to an even greater extent to plaintiff's eighth assignment of error.
The standard of review for general damages is as expressed in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and through Reck [v. Stevens, 373 So.2d 498 (La.1979) ] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
The role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, at 1260. "In effect, the award must be so high or so low in proportion to the injury that it `shocks the conscience.'" Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 879 (La.App. 5 Cir.1991). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La. 1974); Youn, supra.
Accordingly, based on the same reasonable credibility calls and evaluation of expert testimony as was discussed in connection with plaintiff's seventh assignment of error, we conclude that the jury's award of general damages was well within the limits of its great and even vast discretion.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed against the appellant.
AFFIRMED.
NOTES
[1] Mr. Filmore could not be located and attempts to subpoena him for the trial failed. Plaintiff does not contend that any adverse evidentiary inference should be drawn from the failure of Mr. Filmore to attend the trial.
[2] Dr. Martin did not examine the plaintiff. He only reviewed his medical records.